Exhibit A

**LEASE AGREEMENT**

for Premises Located at:

UNIT C-3 THE SANCTUARY DOWNTOWN,

A CONDOMINIUM

Between

**MY PROPERTY HOLDINGS, LLC.**

as Landlord

and

**FUNKY MONKEY, INC.**

as Tenants

Dated: April 15, 2011

## TABLE OF CONTENTS

**Page**

1.    LEASE...................................................................................................1
    1.1.    Demise of Premises.........................................................2
    1.2.    Condition; Landlord's Warranty ..................................2
    1.3.    Use of Premises...............................................................3
    1.4.    Quiet Enjoyment .............................................................3
    1.5.    Tenant's Work .................................................................3
    1.6    Landlord's Work..............................................................3
    1.7    Parking .............................................................................3

2.    TERM OF THIS LEASE ....................................................................4
    2.1.    Initial Term .....................................................................4
    2.2.    Extended Term.................................................................4

3.    BASE RENT; ADDITIONAL RENT...................................................4
    3.1.    Base Rent .........................................................................4
    3.2.    Base Rent for Extended Terms .......................................5
    3.3.    Taxes.................................................................................6
    3.4.    Tenant to Bear Share of Expenses .................................7
    3.5.    Utility Services.................................................................7
    3.6.    Late Charge ......................................................................7
    3.7.    Place of Payment.............................................................7
    3.8.    True Lease.........................................................................7
    3.9    Proportionate Share.........................................................8

4.    SECURITY DEPOSIT.........................................................................8

5.    COMPLIANCE WITH LAW; ENVIRONMENTAL MATTERS .........8
    5.1.    Tenant Compliance with Laws .......................................8
    5.2.    Hazardous Materials .......................................................9
    5.3.    Deleted .............................................................................9

6.    MAINTENANCE AND REPAIR; ALTERATIONS .........................10
    6.1.    Maintenance by Tenant..................................................10
    6.2.    Maintenance by Landlord ..............................................11
    6.3.    Tenant's Work ...............................................................11
    6.4.    Alterations and Additions .............................................12
    6.5.    No Liens...........................................................................13
    6.6.    Signs, Awnings, Canopies.............................................13

7.    RULES AND REGULATIONS...........................................................14

8.    INSURANCE; INDEMNIFICATION .................................................15
    8.1.    Landlord Insurance ........................................................15

|       | 8.2.   | Tenant's Insurance | 15 |
|       | 8.3.   | Casualty | 15 |
|       | 8.4.   | Increase in Fire Insurance Premium | 16 |
|       | 8.5.   | Indemnification | 16 |
|       | 8.6.   | Force Majeure | 18 |
| 9.    |        | CONDEMNATION | 18 |
| 10.   |        | ASSIGNMENT AND SUBLETTING | 18 |
|       | 10.1.  | Transfer of Landlord's Interest | 18 |
|       | 10.2.  | Transfer of Tenant's Interest | 19 |
|       | 10.3.  | Approved of Tenant's Interest | 20 |
| 11.   |        | DEFAULT | 20 |
|       | 11.1.  | Tenant Default | 20 |
|       | 11.2.  | Landlord's Remedies | 21 |
|       | 11.3.  | Landlord's Default | 22 |
|       | 11.4.  | Attorneys' Fees | 22 |
|       | 11.5.  | Waiver of Trial by Jury | 22 |
| 12.   |        | ACCESS BY LANDLORD | 22 |
|       | 12.1.  | Right of Entry | 22 |
|       | 12.2   | Excavation | 23 |
| 13.   |        | MISCELLANEOUS | 23 |
|       | 13.1.  | Notices | 23 |
|       | 13.2.  | Estoppel Certificates | 24 |
|       | 13.3.  | Surrender; Holding Over | 25 |
|       | 13.4.  | Savings Clause | 25 |
|       | 13.5.  | Binding Effect | 25 |
|       | 13.6.  | Table of Contents and Heading | 25 |
|       | 13.7.  | Governing Law | 25 |
|       | 13.8.  | Integration | 25 |
|       | 13.9.  | Subordination to Financing | 26 |
|       | 13.10. | Broker | 26 |
|       | 13.11. | Radon Gas | 26 |
|       | 13.12. | Memorandum of Lease | 27 |
|       | 13.13  | Interpretation | 27 |
|       | 13.14  | Counter-Parts | 27 |
| 14.   |        | SPECIAL CLAUSES | |
|       | 14.1   | Tenant Improvement Credit | 27 |
|       | 14.2   | Guaranty | 27 |

**EXHIBITS:**

| | |
|---|---|
| Exhibit "A" (Composite) | Sketch of Leased Premises |
| Exhibit "B" | Assignment to Interest in Parking Space |
| Exhibit "C" | Personalty |
| Exhibit "D" | Tenant's Work — coming Soon |
| Exhibit "E" | Guaranty |

## LEASE AGREEMENT

**THIS LEASE AGREEMENT** (this "Lease") is made and entered into as of this _____ day of Apr 15 _____, 2011 (the "Effective Date"), by and between **MY PROPERTY HOLDINGS, LLC, a Florida limited liability company** (the "Landlord"), and **FUNKY MONKEY, INC., a Florida corporation,** (the "Tenant"). Landlord and Tenant may be referred to in this Lease individually as a "Party" or collectively as the "Parties."

### Recitals:

A.      Landlord is the owner of certain real property known as Condominium Unit C-3 of The Sanctuary Downtown, a Condominium (the "**Commercial Space**"). Landlord demises and leases to the Tenant, and Tenant rents from Landlord, a portion of the Commercial Space containing approximately 6,353 square foot, a sketch of which is attached hereto as **Composite Exhibit "A"** (the "**Premises**") together with all rights, interests, easements, rights of way and appurtenances related to the Premises, subject to the Declaration, as defined below, including the right to use certain CU-3 Parking Space(s) as defined in Section 1.7 below and upon terms as set forth in the Assignment of Interest in Parking Space, attached hereto as **Exhibit "B"**, and all fixtures and equipment located on or within the Premises, as more specifically described in **Exhibit "C"** attached hereto ("**Personalty**"). The Premises' address is 100 S. Eola Drive, Suites 104 and 105, Orlando, Florida 32801.

B.      The use and occupation by Tenant of the Premises is subject to the Declaration of Condominium of the Sanctuary Downtown, a Condominium as recorded in O.R. Book 8249, Page 2828, as amended by that certain First Amendment thereof, recorded in O.R. Book 9706, Page 6083, all of the public records of Orange County Florida, and the Rules and Regulations, promulgated by the Association pursuant to the Declaration, as the same may be amended from time to time (collectively the "**Declaration**"), and shall include the right to use the outdoor Limited Common Elements adjacent to the Premises, and in common with others the Commercial Space common service areas, service roads, loading facilities, and sidewalks in accordance with the Declaration subject, however, to the terms and conditions of this Lease.

C.      Tenant desires to lease the Premises from Landlord and Landlord desires to lease the Premises to Tenant, upon and pursuant to all of the terms, conditions, covenants and provisions of this Lease, and for the Rents and during the terms described in this Lease.

### Agreements:

**NOW, THEREFORE, IN CONSIDERATION** of the Recitals, which Recitals are deemed a part of this Lease, and in consideration of the Premises leased by Landlord to Tenant pursuant to this Lease, and in consideration of the Rents and covenants to be paid and performed by Tenant pursuant to this Lease, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

1.      **LEASE.**

1.1      <u>Demise of Premises</u>. In consideration of the Rents and covenants stipulated to be paid and performed in this Lease, Landlord hereby leases the Premises to Tenant,



and Tenant hereby lets and accepts the Premises from Landlord, for the term described in this Lease as of the expiration of the Inspection Period (as hereinafter described) provided the Tenant does not terminate the Lease before that date. The Tenant shall have fifteen (15) days from the Effective Date ("Inspection Period")to conduct whatever test, analysis, investigation or inspections of the Premises and all zoning regulations, restrictions, rules and ordinances, building restrictions and other laws and regulations now in effect by any governmental, quasigovernmental or private authority or entity having jurisdiction over or claim against the Premises that it may reasonably see fit to satisfy itself that the Premises is suited for the Tenant's Intended Use. In the event the Tenant determines by its investigation that the Premises is unacceptable, then the Tenant shall have the right to deliver timely written notice to the Landlord before expiration of the Inspection Period, stating the Purchaser's election to terminate this Agreement. Based upon such notification, this Lease shall be terminated and the Base Rent Deposit shall be returned to the Tenant and the parties shall have no further obligations to each other. Landlord shall deliver possession of the Premises to Tenant on the day following the end of the Inspection Period if the Tenant has not exercised its right to terminate as provided herein (the "Delivery Date").

1.2    Condition; Landlord's Warranty.    Except as otherwise provided in this Lease, the Premises are demised and let in their "as is" condition and subject to (a) any state of facts which an accurate survey or physical inspection of the Premises might show; (b) all zoning regulations, restrictions, rules and ordinances, building restrictions and other laws and regulations now in effect or adopted after the Effective Date by any governmental authority having jurisdiction over the Premises, without representation or warranty by Landlord; except that Landlord represents and warrants to Tenant that it has good and reputable fee simple title to the Premises; and, (c) Association review and approval of the Lease and Tenant in accordance with the Declaration.

1.3    Use of Premises.

(a)    Tenant shall occupy and use the Premises as a restaurant with a liquor license and indoor entertainment, if permitted by the Association and in accordance with all zoning regulations, restrictions, rules and ordinances, building restrictions and other laws and regulations now in effect or adopted after the Effective Date by any governmental authority having jurisdiction over the Premises (Tenant's "Intended Use") and for no other purpose without first obtaining the written consent of Landlord. Tenant will not use or permit the use of the Premises or any part of the Premises for any unlawful purpose, or in violation of any ordinances, laws, rules, or regulations of any governmental body or in violation of the Declaration. Tenant shall not do or permit any act which would constitute an illegal condition or intentional waste or which would cause damages to Landlord or which would invalidate any policies of insurance or increase the insurance premiums for the Commercial Space.

(b)    Tenant shall be responsible for obtaining and maintaining in effect all necessary certificates of occupancy, permits and licenses in connection with Tenant's Intended Use from any and all appropriate governmental authorities throughout the Term of this Lease. However, Tenant's obligations under this Lease are expressly contingent upon the issuance by the relevant governmental authorities of all applicable licenses, permits, or other necessary authority required for the lawful operation of Tenant's business consistent with its

Lease Agreement Revised 4-15-11.DOC

Intended Use, (collectively, the **"Permits"**) within thirty (30) days of the Delivery Date. If any application for any of the Permits is denied within said period, Tenant shall have the option to terminate this Lease by giving written notice to Landlord, at which time all of the Tenant's liability and/or obligations under this Lease shall terminate and the Parties shall have no further obligations to each other pursuant to this Lease. The Tenant's opening for business will be deemed a waiver of the right to terminate the Lease in accordance with this provision. If terminated after the Condition Precedent as provided in paragraph 14.1 below, the initial Base Rent deposit (as defined below) will be retained by the Landlord for having entered into this Lease and removing the Premises from the market and giving the Tenant the opportunity to pursue such Permits. The balance of any other sums received shall forthwith be returned to the Tenant upon turn over of possession of the Premises by the Tenant to the Landlord, and the parties will have no further obligation to the other hereunder.

(c) . Tenant shall have exclusive use of the Premises at all times during the Term of this Lease.

1.4 <u>Quiet Enjoyment</u>. For so long as no Event of Default (as defined in this Lease) has occurred and is continuing under this Lease beyond any applicable cure period, Landlord warrants peaceful and quiet enjoyment of the Premises by Tenant against acts of Landlord or anyone claiming by or through Landlord and that Tenant shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease.

1.5 <u>Tenant's Work</u>. Tenant shall construct its own Tenant improvements in the Premises at its sole cost and expense, as Tenant deems necessary for the Intended Use. All of such improvements and work are subject to prior Landlord approval as provided in Section 6.4 hereof. Landlord shall fully cooperate with Tenant to execute, apply for and obtain any and all applications for permits, inspections, certificates and certificates of occupancy and any other necessary documentation to complete the Tenant improvements in a timely manner. Landlord shall execute and deliver any and all of the applications or documentation to Tenant within three (3) business days after Tenant's request for same. The Tenant's minimum contribution for Tenant improvements will be for the items described in Exhibit "D" attached hereto (**"Tenant's Work"**). Tenant's Work shall be completed on or before **90** days from the Delivery Date.

1.6 . <u>Landlord's Work</u>. NONE

1.7 <u>Parking</u>. The Landlord has twenty one (21) parking spaces (**"CU-3 Parking Spaces"**) on the first floor level of the Condominium assigned to the Premises. The Landlord's right to those parking spaces is currently being contested and in litigation. The Tenant shall be permitted to use the CU-3 Parking Spaces that the Landlord shall specify in the Assignment of Interest in Parking Space, during the pending litigation and thereafter, should the Landlord be the prevailing party. This Lease is not conditioned upon, nor shall Rent be abated, reduced or conditioned upon the assignment or Tenant's right to use all of the CU-3 Parking Spaces. The Tenant shall be permitted to share in conjunction with all commercial space occupants of the Sanctuary, the right to use parking spaces, by valet, designation or other means as the Association may delegate and authorize in accordance with the Declaration.



2.    <u>**TERM OF THIS LEASE**</u>.

2.1    <u>Initial Term</u>.    Tenant shall have and hold the Premises for an initial term commencing on the first day of a calendar month after the Rent Commencement Date (as defined below) (the "**Commencement Date**"), and ending on **the last day of the Sixtieth (60ᵗʰ) calendar month after the Commencement Date (the "Initial Term"**).

For purposes of this Lease, a "**Lease Year**" shall be defined as that twelve (12) consecutive month period during the Initial Term or any applicable Extended Term (defined in this Lease) commencing on the Commencement Date and the annual anniversary of the Commencement Date, as may be applicable; provided, however, the first Lease Year shall include that period of time from the Rent Commencement Date up to the Commencement Date. The Initial Term and any applicable Extended Term (with respect to which a right and option have been exercised) are sometimes collectively referred to in this Lease as the "**Term**" or "**Lease Term**."

2.2    <u>Extended Term</u>.    Tenant shall have the right and option to extend the Term of this Lease ("Renewal Option") for **one (1) extended term of five (5) years** (the "Extended Term"). The Extended Term shall commence on the day immediately succeeding the expiration date of the Initial Term and shall end at midnight on the day immediately preceding the fifth (5th) anniversary of the first day of such Extended Term. Provided no Event of Default shall exist at the time of exercise of such Renewal Option, Tenant may exercise the Renewal Option to extend this Lease for the Extended Term by giving written notice to that effect to the Landlord not less than **One Hundred and Eighty (180) days** prior to the expiration date of the then existing Term.

To avoid forfeiture of Tenant's right to extend the Term of this Lease under the option set forth in this Section through inadvertent failure to give notice of exercise thereof within the time limits prescribed, Tenant shall not be deemed to forfeit its right to renew until such time as Landlord gives written notice to Tenant of Tenant's failure to provide a timely notice to exercise the Renewal Option. The Tenant shall have ten (10) days from said Notice to exercise the Renewal Option. Only upon Tenant's failure to exercise such Renewal Option within the additional 10-day notice period shall Tenant's option to renew terminate.

3.    <u>**RENT\ADDITIONAL RENT**</u>.    All sums due by the Tenant to the Landlord hereunder, regardless if referred to or not as rent shall be shall be deemed to be and sometimes collectively referred to herein as the "Rent."

3.1    <u>Base Rent</u>.    Commencing on the earlier of ninety (90) days from the Effective Date or the day the Tenant opens the Premises (or any portion thereof) for its Intended Use (the "**Rent Commencement Date**"), Tenant covenants to pay to Landlord base rent ("**Base Rent**") as follows:



| Lease Year | Annual | Monthly | Rate per sq. ft. |
|---|---|---|---|
| First | $139,766.00 | $ 11,647.17 | $22.00 |
| Second | $143,958.98 | $ 11,996.59 | $22.66 |
| Third | $148,279.02 | $ 12,356.59 | $23.34 |
| Forth | $152,726.12 | $ 12,727.18 | $24.04 |
| Fifth | $ 157,300.28 | $ 13,108.36 | $24.76 |

The sum of **$20,000.00** shall be paid by the Tenant to the Landlord upon the execution of this Lease ("**Base Rent Deposit**"). Said sum is non-refundable, except only in the event the Association does not approve the Tenant as provided in 1.2 (c) above. In such event the funds will be returned to the Tenant forthwith upon delivery of possession of the Premises to the Landlord, and the parties will have no further obligation of each to the other hereunder. Otherwise, said sum will be applied toward the Security Deposit (as defined hereinafter). The first monthly Base Rent shall be paid within three (3) business days of satisfaction of the Conditions Precedent as defined in paragraph 14.1, Special Clauses below; but in no event later than the Commencement Date. Thereafter Base Rent shall be paid in equal monthly installments due in advance on or before the first day of each and every month during the Term of this Lease.

3.2     Base Rent for Extended Terms. Provided that Tenant exercises its Renewal Option for the first Extended Term, Tenant covenants to pay to Landlord Base Rent for the Extended Term in equal monthly installments an amount calculated as noted below. For the purpose of calculating said sum, the Consumer Price Index means that for all urban consumers, United States, all items (1982-84 = 100), as published by the U.S. Department of Labor's Bureau of Labor Statistics (Index). In the event the Index is discontinued or published less frequently, or is altered in some manner which does not reasonably reflect the Consumer Price Index, the Landlord shall adopt a substitute Index or procedure which reasonably reflects and monitors consumer prices. The Base Period Index shall be compared with the Index for the "Comparison Month" (as said terms are defined below) for each extended Lease Year. If the Index for any Comparison Month is higher than the Base Period Index, then the Base Rent for the next Lease Year, effective the first month of such Lease Year, shall be increased by the identical percentage (i.e., the Base Rent shall increase by the percentage increase in the cost of living, subject to any limitations thereon as may be set forth in this Lease). .

3.2.1     The Base Rent for the first Lease Year of the Extended Term shall be the greater of $26.00 per square foot or a sum equal to the Base Rent for the first year of the Initial term increased by a percentage equal to the total increase, if any, in the Consumer Price Index for each year during the Initial term. Other than the initial (first) year of the extended term, the annual increase of Base Rent shall not exceed five (5%) percent per annum

The Base Period Index shall be the Index for **April, 2011.**
The Comparison Month for the initial (first) year of the Extended Term shall be **April, 2016.**

3.2.2    The Base Rent for each succeeding Lease Year of the Extended Term shall be the greater of (i) the Base Rent for the preceding Lease Year; or, (ii) the Base Rent of the prior Lease Year increased by the increase in the Consumer Price Index for that Lease Year. For the purpose hereof:

(i) The Base Period Index shall be the Index for **April immediately preceding the prior Lease Year of the Extended Term**.
(ii) The Comparison Month shall be **April of the prior Lease Year.**

3.3    <u>Taxes</u>. In addition to Base Rent, Tenant agrees to pay its Proportionate Share (as defined in 3.9 below) of all Realty Taxes as defined below, which may be levied or assessed by any lawful authority against the Commercial Space. Commencing with the Rent Commencement Date, Tenant shall pay in monthly installments, concurrently with Base Rent, based upon Landlord's good faith estimate of Realty Taxes for the year in question. The monthly payments thereof currently estimated at **$1,581.59 per month** (and future payments) are subject to increase or decrease as determined by Landlord from time to time to reflect an accurate estimate of actual Realty Taxes.

"**Realty Taxes**" shall mean any property taxes and assessments imposed upon the Commercial Space and improvements thereon, excluding any furniture fixtures or equipment located on about, which are taxed separately by personal property taxes. If due to a change in the method of taxation, any franchise, income or profit tax shall be levied against Landlord in substitution for or in lieu of any tax which would otherwise constitute a real estate tax, such franchise, income or profit tax shall be deemed to be a Realty Tax for the purpose of this Lease. Assessment shall mean only those installments which are payable for the year in question or which would be payable for the year if Landlord elected to pay the assessment in installments. Taxes shall not include any income, franchise, inheritance, gross receipts, or transfer taxes. In addition, with respect to any assessments included within Realty Taxes, where such assessments are or may be payable in installments over more than one calendar year, such assessments shall be allocated over the maximum period available under such election, irrespective of whether over what period Landlord may in fact elect to pay such installments.
Should the Landlord or Tenant elect to protest the assessment and calculation of the applicable Taxing Authorities they may do so. The parties agree to cooperate in such efforts. Any reasonable expenses incurred by in reducing or maintaining the existing level of such tax obligations to the Taxing Authorities, shall credited or assessed in the calculation of sums due hereunder.

Landlord will submit within thirty (30) days of paying any tax bill (payments shall be made timely to maximize the discount available by the applicable Taxing Authority) a recap and recalculation of the Tenant's Proportionate Share contribution for the subsequent Lease Year of such taxes, accompanied by copies of the appropriate tax bills. If the total billing for taxes, less the amount previously paid by the Tenant result in an overpayment or under payment of greater than $360.00, the Tenant will either receive a refund within 30 days for any overpayment or, will remit within 30 days any balance due to Landlord for additional taxes. The monthly amount to be paid on account will be revised each year to more closely reflect one-twelfth (1/12th) of Tenant's share of Realty Taxes most recently determined.



3.3.1   <u>Personal Property Tax.</u>   Tenant shall pay all taxes levied against personal property, trade fixtures, furniture and equipment placed in the Premises. If any such taxes are levied against Landlord or Landlord's property and Landlord elects to pay the same, or if the assessed value of Landlord's property is increased by inclusion of Tenant's personal property, trade fixtures, furniture and equipment and Landlord elects to pay the taxes based on such increase, Tenant shall pay such amount to Landlord as additional rent upon demand that part of such taxes for which Tenant is primarily liable. Landlord may employ professionals to attempt to assure a fair Tax burden on the Commercial Space, and the cost thereof, as well as any fees, expenses and costs incurred in contesting any assessments, levies or the tax rate applicable to the Commercial Space, shall be Operating Expenses, as hereinafter defined.

3.3.2   <u>Taxes on Rent.</u>   In addition to all Rent payable by Tenant to Landlord, Tenant must pay to Landlord with each payment of Rent an amount equal to the applicable sales tax on all amounts paid as Rent pursuant to the terms of this Lease, which sum Landlord must pay to the State of Florida pursuant to the Florida Sales Tax Statute. Landlord will receive no monetary benefit from the collection and disbursement of this charge. Therefore, to satisfy this obligation, Tenant shall pay to Landlord, in addition to the Rent agreed to by the Parties, the applicable sales tax on all amounts paid as Rent pursuant to the terms of this Lease. Should such tax rate change under the Florida Sales Tax Statute, Tenant must pay Landlord the amount reflective of such change.

3.4   <u>Tenant to Bear Share of Operating Expense.</u>   Tenant agrees to pay its Proportionate Share of the monthly maintenance assessments and charges, which are levied against the Commercial Space by the S.C.O. Condominium Association, Inc pursuant to the Declaration. The monthly payments thereof currently estimated at **$ 2,070.17 per month** (and future payments) are subject to increase or decrease as determined by Association from time to time.

In addition Tenant agrees to pay any special condominium assessments and charges, which may be levied or assessed upon the Premises by the S.C.O. Condominium Association, Inc. ("**Association**") pursuant to the Declaration. Any such special assessments permitted to be paid in installments by the Association (vs. lump sum payment), regardless if Landlord elects to pay said special assessment in a lump sum, shall be paid by Tenant on a monthly basis to the Landlord in an amount equal to that amount calculated to be due by the Association for installment payments on a monthly basis over the remaining term of the Lease, or until paid in full, whichever is earlier. If any such assessment is for a capital improvement, repair or replacement and the special assessment assessed upon the Premises is in excess of Five Thousand ($5,000), and the Association does not permit payment by installment, the Landlord shall pay said special Assessment, and the Tenant shall pay to the Landlord the amount due in monthly installments of not more than $1,000.00 per month until paid in full, or the end of the Term of the Lease (or extension thereof), whichever is earlier.

3.5   <u>Utility Services.</u>   Tenant shall be solely responsible for, and shall promptly pay, all charges for the use and consumption of water, chilled water, sewer, gas, phone and electricity and any other utility services used within the Premises that are separately metered.



3.6   Late Charge.   If any installment of Rent is not paid within five (5) days after the same is due, Tenant shall pay to Landlord, on demand, as Additional Rent, a late charge equal to three percent (3%) on the amount due.

3.7   Place of Payment.   All payments of Rent shall be made and paid by Tenant to Landlord and sent to **John P Wilkes PA, 901 South Federal Highway, Suite 101A, Fort Lauderdale, FL 33316**, or at such other place as Landlord, from time to time, may designate in writing to Tenant pursuant to the notice provision in this Lease.

3.8   True Lease.   Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement. Each Party shall reflect the transactions represented by this Lease in all applicable books, records and reports (including, without limitation, income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

3.9   Proportionate Share.   The Base Rent and all Rent sums due hereunder are based upon an agreed allocation of the portion of the Commercial Space allocated to the Premises **(100%)**, calculated on the estimated square footage, relative Limited Common Elements associated with the Premises, and other intangibles, such that the specific figures and allocation provided herein shall govern, regardless of any variation in actual net useable space.

4.   **SECURITY DEPOSIT.**

On or before the Rent Commencement Date the Tenant shall pay to the Landlord the sum **of Thirty Thousand Dollars ($30,000.00) [TBD upon review of financials and guaranty]** (the "Security Deposit") to be held by Landlord as security for the performance by Tenant of all of the terms, covenants and conditions contained in this Lease and the payment of Rent or any other sum due Landlord pursuant to the terms of this Lease [all or a portion of the Security Deposit shall be paid by application of the lease deposit referenced in paragraph 3.1 above. It is expressly understood that such deposit shall not be considered an advance payment of Rent or a measure of Landlord's damages in the event of Event of Default by Tenant. Landlord shall have the right to apply all or any part of the Security Deposit against any damage, injury, expense or liability caused Landlord by Tenant's default, including, but not limited to: (a) loss or damage to the Premises caused by Tenant; (b) the cost of restoring the Premises, except for reasonable wear and tear, to the same condition it was in at the time Tenant began occupancy of the Premises; (c) Rent payments which remain due and owing beyond any applicable grace period. Landlord may apply all or any part of the Security Deposit to cure any default by Tenant hereunder, and Tenant shall promptly restore to the Security Deposit all amounts so applied upon invoice. Landlord shall not be limited in pursuing Landlord's remedies against Tenant for costs, losses or damages to the Premises for any such costs, losses or damages which are in excess of the Security Deposit. Such money shall bear no interest and may be commingled with other security deposits or funds of Landlord. Landlord shall return the Security Deposit, or any portion of the Security Deposit, as applicable, to Tenant within thirty (30) days after the expiration date or earlier termination of this Lease. Landlord may deliver the funds deposited hereunder by Tenant to the purchaser or transferee of Landlord's interest in the Premises in the event that such interest be sold or transferred, and, in the event the purchaser or transferee assumes the obligations of Landlord, thereupon Landlord shall be discharged from any further liability with respect to such Security Deposit.



## 5.    COMPLIANCE WITH LAW; ENVIRONMENTAL MATTERS

5.1    Tenant Compliance with Laws.  At its expense, Tenant shall comply with and shall cause the Premises to comply with all applicable governmental statutes, laws, rules, orders, regulations, ordinances, and the terms of the Declaration and throughout the Term of this Lease.  Tenant shall be responsible for paying any and all fines or penalties for the failure of Tenant to comply with all laws, codes, regulations, ordinances and terms of the Declaration as required by regulations of governing authorities during the Term of this Lease, other than as a result of the failure of Landlord to comply with all laws, codes, regulations and ordinances as required by regulations of governing authorities.

5.2    Hazardous Materials.

(a)    For the purposes of this Lease:  (1) the phrase "Hazardous Material" means any hazardous or toxic materials, substances or wastes which are defined by those or similar terms or is regulated as such under any Environmental Laws; and (2) the phrase "Environmental Laws" means any statute, law, ordinance, rule or regulation of any local, county, state or federal authority having jurisdiction over the Premises or any portion of the Premises or its use, as the same may be amended from time to time, including but not limited to the Federal Water Pollution Control Act (33 U.S.C. Section 1317); the Federal Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.); the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. Section 9601 et seq.); the Toxic Substance Control Act (15 U.S.C. Section 2601); the Clean Air Act (42 U.S.C. Section 7401); and the Hazardous Materials Transportation Act (49 U.S.C. Section 1802 et seq.), as amended from time to time, and regulations promulgated thereunder.  Tenant shall, during the Term of this Lease:

(i)    not cause or permit any Hazardous Material, except for items sold or used in the ordinary course of Tenant's business and for which any required licenses and permits are issued, to exist on or be discharged from the Premises, and shall defend, indemnify and hold Landlord harmless from any and all claims, expenses, liability, losses or damage suffered or incurred by Landlord due to the existence upon, or discharge from, the Premises of any Hazardous Material at any time prior to the expiration of the Term of this Lease; and

(ii)    comply, and cause the Premises to comply, with all Environmental Laws pertaining to Hazardous Materials.

(b)    Landlord shall deliver the Premises to Tenant in compliance with all Environmental Laws including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9061 et seq., as may be amended from time to time, and the Hazardous Materials Transportation Act, 49 U.S.C. Section 1802 et seq., as may be amended from time to time.  Landlord hereby represents and warrants that Landlord knows of no violation of any Environmental Laws and has received no notice (written or oral) of any violation of any Environmental Laws.  In addition, Landlord agrees to indemnify and hold Tenant harmless from and against any and all loss, claim, liability, damages,



injuries to person, property, or natural resources, cost, expense, action or cause of action, arising in connection with the release or presence of any "Hazardous Material" at the Premises, through the acts of Landlord or the Landlord's agents, employees, representatives or invitees, or any prior owner or tenant of the real property upon which the Premises is located, whether foreseeable or unforeseeable.

     5.3   <u>Intentionally Omitted.</u>

## 6.   <u>MAINTENANCE AND REPAIR; ALTERATIONS.</u>

    6.1   <u>Maintenance by Tenant.</u> Except as provided in Section 6.2 hereof, Tenant shall, at Tenant's expense, at all times keep the Premises (interior and exterior) and appurtenances thereto, in good order, condition, and repair, clean, sanitary, and safe, including the replacement of equipment, fixtures, and all broken glass (with glass of the same size and quality) and shall, in a manner satisfactory to Landlord, decorate and paint the Premises when necessary to maintain at all times a clean and sightly appearance. In the event Tenant fails to perform any of its obligations as required hereunder, Landlord may, but shall not be required to, perform and satisfy same with Tenant hereby agreeing to reimburse Landlord, as Additional Rent, for the cost thereof promptly upon demand. Tenant shall make any and all additions, improvements, alterations, and repairs to or on the Premises (including, without limitation, all modifications to any fire sprinkler system located within the Premises, bathrooms, ventilation hoods, HVAC, Plate Glass window or door replacement, sewer system clean out or back flow preventer installation, repair or replacement  ), other than those required for the structural repair and maintenance of the roof, foundation, or exterior walls, which may at any time during the Lease Term be required or recommended by any lawful authorities, insurance underwriters, Inspection Rating Bureaus, or insurance inspectors designated by Landlord. Landlord may, but shall not be obligated to, deal directly with any authorities respecting their requirements for additions, improvements, alterations, or repairs. All such work shall be performed in a good and workmanlike manner in accordance with the requirements set forth in Section 6.3. All Tenant work and all such additions, improvements, and alterations thereto shall become the property of the Landlord upon the expiration or earlier termination of this Lease.

      The Tenant covenants that it will, at its own expense, keep all improvements now or hereafter built on the Premises, and all appurtenances, Personalty, fixtures and equipment thereon contained, in good order, condition and repair, at all times during the term of this Lease, normal wear and tear only excepted, including but not limited to electrical fixtures and equipment, walls (interior) of the buildings, in good and substantial condition and repair and in a clean and sanitary condition. Further, Tenant will use, keep and maintain the Premises and improvements thereon in conformity to and in compliance with all existing and future statutes, laws, orders, ordinances, ruling and regulations applicable thereto, of the governmental authority having jurisdiction thereof and will protect and indemnify the Landlord from and against any loss, costs, damages and expenses occasioned by or arising out of any provisions, conditions, covenants, and stipulations in this Lease contained, or occasioned by or arising out of any accident or injury, or damage to any person whomsoever or whatsoever happening, or done in or about or upon the said Premises or due directly or indirectly to the construction, tenancy, use or occupation of said Premises, by the Tenant or any person or persons occupying, holding or claiming, by, through or under it.  Tenant agrees that upon the expiration of the Initial Term




hereof or any Extended Term, it will surrender and deliver up the possession of the Premises to the Landlord in as good a state and condition or repair as when leased by Tenant, ordinary wear and tear, damage by fire or other elements, acts of God, war or governmental authority alone excepted.

Should any major electrical, plumbing, or HVAC improvement, replacement or repair (for the purpose hereof major shall mean a cost in excess of $2,500 and have a life of use expectancy greater than five (5) years) be required in the last two(2) years of the Lease term (Initial Term if the Option to extend the Lease is not exercised) said cost shall be amortized over the life of the repair and the Tenant would be responsible for its prorata obligation thereof based upon the ratio of the balance of the term to life of use expectancy of said repair, improvement or replacement.

The costs of the Tenant's obligations under this paragraph may be reimbursed if covered by Association's Insurance or any other tenant/owner within the building within which the Premises is situated for any such damage or repair.

6.2     Maintenance by Landlord.  The Premises is a portion of a Condominium Unit as described in the Declaration. As such, it is the obligation of the Association to maintain and repair the exterior supporting walls, the foundations, roof, roof drains and structural portions of the building creating the Premises' space. All of said Common Elements shall be maintained by the Association, and the Landlord shall enforce the performance of the Association as required by the Declaration and hold the Tenant harmless from any such obligations, provided that Tenant shall promptly give Landlord written notice of the necessity for such repairs, and provided that the damage thereto shall not have been caused by negligence of Tenant, its concessionaires, officers, agents, employees, licensees, or invitees; in which event Tenant shall be responsible there for. Landlord shall have no obligation to repair, maintain, alter, or perform any other acts with reference to the Premises or any part thereof, or any plumbing, heating, ventilating, electrical, air conditioning, other mechanical installations therein, broken plate or window glass, doors or door closure devices, moldings, locks or hardware.

6.3     Tenant's Work.  All Tenant's work, improvements, alterations, replacements, and repairs to the Premises pursuant to this Lease shall conform to all applicable governing codes. Tenant shall complete any work required to open and remain open during the term of this Lease for business. All work done by Tenant shall be done by licensed contractors. Landlord may post notice on non-responsibility for Tenant's work. Tenant will require any contractor or sub-contractor to properly remove and dispose of all debris and rubbish caused by the work and upon completion to remove all temporary structures, debris and rubbish of whatever kind remaining on any part of the building in which the Premises in accordance with the Declaration.

For any substantial alterations or repairs (in excess of $50,000 in aggregate) Tenant and/or Tenant's contractors and sub-contractors shall be required to provide, in addition to the insurance required to be maintained by Tenant, the following types of insurance and the following minimum amounts naming Landlord and the Association if required by the Declaration as an additional insured as their interest may appear, issued by companies approved by Landlord.



(a)    Workmen's Compensation coverage with limits of at Least $500,000.00 for the employer's liability coverage thereunder.

(b)    Builders Risk-Completed Value fire and extended coverage covering damage to the construction and improvements to be made by Tenant in amounts at Least equal to the estimated completed cost of said construction and improvements with 100% coinsurance protection.

(c)    Automobile Liability coverage with bodily injury limits of at Least $500,000.00 per person, $1,000,000.00 per accident and $500,000.00 accident for property damage.

(d)    Payment and Performance bonds for 100% of the value of work to be accomplished. All bonds shall be dual or multiple obligee bonds, inuring to the benefit of Landlord, Tenant, and other persons as Landlord shall require. Original or duplicate policies for all of the foregoing insurance shall be delivered to Landlord before Tenant's Work is started and before any contractor's equipment is moved to any part of the building in which the Premises is situated. In all other respects the insurance coverage above mentioned shall comply with the provision of Section 8 of this Lease.

      6.4 <u>Alterations and Additions</u>.    At its expense, Tenant may make non-structural, additions to and alterations of the Premises, and make substitutions therefore and replacements thereof only upon the prior written consent of Landlord. All work shall be done with minimum interference with other occupants of the Condominium in which the Premises is situated; in accordance with Section 6.3 above; and, subject to the limitations of 6.5 below.

      (a)    Tenant shall, at Tenant's sole expense, install all trade fixtures and equipment required to operate its business (all of which shall be of first-class quality and workmanship). All trade fixtures. signs, or other personal property installed in the Premises by Tenant shall remain the property of Tenant and may be removed at any time provided that Tenant is not in default hereunder and provided the removal thereof does not cause, contribute to, or result in Tenant's default hereunder; and further provided that Tenant shall at Tenant's sole expense promptly repair any damage to the Premises resulting from the removal of personal property and shall replace same with personal property of like or better quality. The term "trade fixtures" as used herein shall not include carpeting, floor coverings, attached shelving, lighting fixtures other than free-standing lamps, wall coverings, or similar Tenant improvements which shall become the property of Landlord upon surrender of the Premises by Tenant for whatever reason. Tenant shall not attach any fixtures or articles to any portion of the Premises, nor make any alterations, additions. improvements, or changes or perform any other work whatsoever in and to the Premises, other than minor interior, cosmetic and decorative changes which do not exceed Ten Thousand and No/100 Dollars ($10,000.00) in the aggregate per Lease Year, without in each instance obtaining the prior written approval of Landlord. Any alterations, additions, improvements, changes to the Premises or other work permitted herein shall be made by Tenant at Tenant's sole cost and expense in the manner set forth in Section 6.3



(b)    All fixtures installed by Tenant shall be new or completely reconditioned. Tenant shall not make or cause to be made any alterations, additions or improvements or install or cause to be installed any trade fixture, exterior signs, floor covering, interior or exterior lighting, plumbing fixtures, shades or awnings or make any changes to the store front without first obtaining Landlord's written approval and consent which consent will not unreasonably be withheld. However, such approval may also require Association approval. Tenant shall present to the Landlord plans and specification for such work at the time approval is sought.

(c)    All alteration, decorations, additions and improvements made by the Tenant, or made by the Landlord on the Tenant's behalf by agreement under this Lease, shall remain the property of the Landlord, subject to the Tenant's right to use thereof, for the Term of this Lease, or any extension or renewal of this Lease. Such alterations, decorations, additions and improvements shall not be removed from the Premises prior to the end of the Term without prior consent in writing from the Landlord. Upon expiration of the Term, the Tenant shall not remove all such alterations, decorations, additions and improvements from the Premises unless required as a condition of approval by Landlord. If required to be removed as a condition of approval for such improvements by the Landlord, the Tenant shall remove all such alterations, decorations, additions and improvements. In such event, if the Tenant fails to remove such alterations, decorations, additions and improvements and restore the Premises, then upon the expiration of this Lease the Landlord may remove such alterations, decorations, additions and improvements and restore the Premises with the cost thereof charged to the Tenant. Notwithstanding the foregoing, it is expressly understood and agreed to between the Parties that Tenant shall be allowed to remove its furniture and moveable trade fixtures, provided Tenant restores the Premises to its original condition, as provided in paragraph 6.4(a) above.

6.5    No Liens.    Tenant shall promptly pay all contractors and material men, so as to minimize the possibility of a lien attaching to the Commercial Space. Nothing contained in this Lease shall be construed to confer upon any party, including, without limitation, materialmen and contractors, the right to file a construction or materialmen's lien or other lien or any claim relating to such lien, nor to perform any labor or to furnish any materials for the account of Landlord in respect to the construction of any improvements, alterations or repairs to the Premises by Tenant, its employees, agents or contractors. Within thirty (30) days from receipt of notice from Landlord (or any third party claimant) of the nature and existence of any such lien, Tenant shall discharge, bond or otherwise remove any construction, materialmen's or other lien filed as a result of any such work; provided, however, Tenant specifically reserves the right to contest such lien by the institution of appropriate legal proceedings or otherwise. Additionally, the following provision is applicable and may be included by the Landlord in a Memorandum of Lease or other instrument that may be recorded in accordance with Section 13.25.

"All persons to whom these presents may come are put on notice of the fact that Tenant shall never, under any circumstances, have the power to subject the interest of Landlord in the Premises to any construction or materialmen's lien or liens of any kind, and all persons dealing with Tenant are hereby put on notice that they must look solely to the interest of Tenant in the Premises and not to that of Landlord. The fact that Landlord may permit the construction, repair or renovation of structures shall not be taken as though Landlord required or solicited such



construction or improvements, but only as Landlord's permission given for the use of the Premises under ordinary lease conditions."

It is the intent of the Parties that the provisions of this Section 6.5 comply with Section 713.10, Florida Statutes. The terms and provisions of this Paragraph 6.5 shall survive the expiration or earlier termination of the Term of this Lease.

6.6    Signs, Awnings, Canopies.    Tenant will not place or suffer to be placed or maintained on any exterior door, wall or window of the Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Premises that may be visible from the exterior of the Premises, without first obtaining Landlord's written approval and consent. Said consent will not unreasonably be withheld, but may be subject to Association approval and subject to limitations imposed by the Declaration. Landlord further agrees that Tenant shall have the right, subject to approval as noted above, and all applicable local and state municipal codes and ordinances, to place sign(s) on the exterior sign fascia above the Premises on the south and west faces of the building. Tenant further agrees to maintain such sign, awning, canopy, decoration, lettering, advertising matter or other thing, as maybe approved, in good condition and repair at all times. Tenant shall be responsible for, and shall pay the cost of repair thereof, any and all damage caused in whole or part by Tenant's sign or other installation by Tenant.

7.    **RULES AND REGULATIONS.**

Tenant acknowledges and agrees that the Lease of the Premises is subject to and Tenant shall be bound by the terms and conditions of the Declaration, including the Rules and Regulations of the "Association" as described therein, and as the same may be amended from time to time. Tenant acknowledges having received a copy of the same upon the execution hereof to review. The Tenant shall advise the Landlord of any notices received from the Association regarding the Premises or the Tenant's occupation thereof. The Landlord will advise and provide a copy to the Tenant of any modifications to the Declaration and Condominium Documents that it has received. The Tenant further agrees that it shall comply with and observe the Condominium Documents. Tenant's failure to keep and observe the same shall constitute a breach of the terms of this Lease in the manner as if the same were contained in this Lease as covenants.

A portion of the Rent received by the Tenant is used by the Landlord to pay maintenance fees due the Association in accordance with the Declaration. Should the Landlord fail to make such payments, the Tenant may be prohibited from access to Parking Spaces and other amenities until such time as said Association fees are paid and in good standing. The Tenant may pay to the Association the Assessments due, and deduct the said amount from the rent due the Landlord, if the Association has provided written notice of such deficiency to the Landlord and Tenant in accordance with F.S. 718.116(2010), and the Landlord has not cured said default within ten (10) days of the date of delivery of said notice. To the extent necessary, to enforce the terms hereof, the Association shall be a third party beneficiary to this Agreement.



8.    **INSURANCE; INDEMNIFICATION**.

8.1    <u>Landlord Insurance</u>. Landlord, shall not be required to maintain, any insurance other than the insurance on the Commercial Space provided by the Association.

8.2    <u>Tenant's Insurance</u>.  Tenant shall procure and maintain throughout the Term, at its sole expense:

(a) Workers' Compensation and Comprehensive General Liability Insurance (with contractual liability endorsement) insuring Landlord and Tenant against all claims arising out of Tenant's use or occupancy of the Premises or the condition of the Premises, in an amount not less than $1,000,000 in respect of injuries to, or death of, any one person, and in an amount not less than $2,000,000 in respect of any one occurrence or disaster, and in an amount not less than $1,000,000 in respect of property damaged or destroyed;

(b) fire and extended coverage insurance covering the replacement cost of all alterations, additions, partitions, improvements, and the Personalty and all personal property installed or situated within the Premises;

(c) business interruption insurance, insuring loss of profits and rents in the event of an insured peril damaging the Premises;

(d) liquor liability coverage will also be required, should the Tenant's Intended Use include the serving of alcoholic beverages;

(e) insurance covering glass breakage in the Premises; and

(f) insurance coverage required by the Association in accordance with the Declaration, if any.

All policies of insurance shall name Landlord as an additional insured/payee; be issued by an insurance company acceptable to Landlord; provide that they shall not be canceled unless thirty (30) days prior written notice shall have been given to Landlord; be delivered to Landlord prior to the Commencement Date and upon each renewal of coverage; and provide primary coverage to Landlord on all improvements, fixtures, equipment to or within the Premises and upon the Personalty, regardless if any policy issued to Landlord is similar or duplicate in coverage (Landlord's policy shall be excess over Tenant's policies).

Tenant will not permit the Premises to be used in any manner that would void the insurance thereon.

8.3    <u>Casualty</u>. If all or any part of the Premises shall be damaged or destroyed by casualty, Tenant shall use available insurance proceeds to repair the Premises to the condition as existed on the date of possession of the Premises to Tenant.  Landlord shall not be liable for



any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business as a result of such damage or the repair of such damages. Rent shall not abate.

Notwithstanding the foregoing to the contrary, Landlord or Tenant may elect to terminate this Lease, by providing written notice thereof to the other, if the repairs necessary to restore the premises to a condition that existed prior to the casualty will take more than one hundred eighty (180) days under existing governmental laws and regulations to complete, or if fifty percent (50%) or more of the Premises and the Improvements (and based upon the replacement cost compared with the market value of the Premises and Improvements immediately prior to such fire or other casualty, as shown by certificate of Landlord's architect) or, is destroyed or rendered untenantable; or such casualty occurs during the last year of the Initial Term, or any Extended Term of this Lease, by giving written notice of termination to the other Party within thirty (30) days of such casualty; provided, however, Tenant shall have the right to nullify any Landlord termination by exercising the Renewal Option to extend this Lease (if available). If such notice of termination is given within this thirty-day period, this Lease shall terminate and Rent and all other charges shall abate from the date of such casualty, provided, however, Landlord shall be entitled to all of the insurance proceeds covering such damages and loss of revenue until the expiration of the existing term, or the anticipated completion date of the repairs or improvements, whichever is earlier. Further, upon verification of entitlement and receipt of insurance proceeds for such damage, the Landlord shall repay to Tenant any Rent paid in advance, which has not been earned as of the date of such casualty.

8.4    Increase in Fire Insurance Premium. Tenant agrees that it will not keep, use, sell or offer for sale in or upon the Premises any article which may be prohibited by the standard form of fire insurance policy. Tenant agrees to pay any increase in premiums for fire and extended coverage insurance that may be charged during the Term of this Lease on the amount of such insurance which may be carried by Association, resulting from the type of merchandise sold by Tenant in the Premises, whether or not Landlord has consented to the same. In determining whether increased premiums are the result of Tenant's use of the Premises, a schedule, issued by the organization making the insurance rate on the Premises, showing the various components of such rate, shall be conclusive evidence of the several items and charges which make up the fire insurance rate on the Premises. In the event Tenant's occupancy causes any increase of premium for the fire, boiler and/or casualty rates on the Premises or any part of the Premises above the rate for the least hazardous type of occupancy legally permitted in the Premises, the Tenant also shall pay in such event as Additional Rent, any additional premium on the insurance policy carried by the Association for the building within which the Premises is situated. Bills for such additional premiums shall be rendered by Landlord to Tenant, if required by the Association, and shall be due and payable by Tenant when rendered.

8.5    Indemnification.

(a)    Tenant agrees to protect, defend, indemnify and save harmless Landlord from and against any and all liabilities, losses, damages, costs, expenses (including all reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments for any injury to, or the death of, any person or damage to property (including property of employees and invitees of Tenant) on the Premises in any manner growing out of or connected with the use, non-use, condition or occupation of the Premises, so long as not occasioned by the



gross negligence or willful misconduct of Landlord, its agents, employees, contractors, invitees or assigns. Landlord shall not be liable to Tenant or to Tenant's employees, agents, or visitors for injury to person or damage to or loss of property on or about the Premises or any common area or limited common area appurtenant thereto, caused by the negligence or misconduct of Tenant, its officers, partners, employees, agents, sub-tenants, licensees, concessionaires, visitors or any other person entering into the premises arising out of the use of the Premises by the Tenant and the conduct of the business thereon, or arising out of any breach or default by the Tenant in the performance of its obligations hereunder. Tenant waives all claims against Landlord arising from any liability described in this Section 8.5 except to the extent arising out of or caused by the gross negligence or willful misconduct of Landlord, any mortgagee of the Premises, or the agents, employees, contractors, invitees or assigns of either Landlord or any mortgagee of the Premises. The Landlord shall further not be liable to the Tenant or any other party affiliated with the Tenant or the operation of its business within the Premises, arising out of the repair or damage or the defect in or failure of any equipment, pipes, wiring, broken glass, the backing up of drains or by gas, water, steam, electricity or oil leaking or flowing into the Premises, regardless of the source or if caused by other tenants within the Commercial Space or building within which the Premises is situated.

        The provisions of this Section shall survive the termination of this Lease with respect to any claims or liability occurring prior to such termination.

        (b)  Should any claim be made against Landlord for any matter covered under Section 8.5(a), Landlord shall promptly give Tenant written notice of any such claim, and Tenant shall thereafter defend or settle any such claim, at its sole expense, on its own behalf and with counsel of its selection; provided, however, that Tenant's counsel shall be competent counsel experienced in the type of litigation or claim at issue and shall be acceptable to Landlord, acting reasonably. Upon Tenant's assumption of the defense of any claim against Landlord pursuant to Tenant's indemnity under Section 8.5(a), Landlord shall have the right to participate in the defense or settlement of the claim with counsel retained and paid by Landlord, and Tenant shall cause the attorneys retained by it to consult and cooperate fully with counsel for Landlord. In such defense or settlement of any claims, Landlord shall provide Tenant with originals or copies of all relevant documents and shall cooperate with and assist Tenant, at no expense to Landlord. Notwithstanding any provision of this Section 8.5 to the contrary, Tenant shall not enter into any settlement or agreement binding upon or adversely affecting Landlord, or admit any liability or fact in controversy binding upon or adversely affecting Landlord, without the prior written consent of Landlord, such consent not to be unreasonably withheld or delayed.

        (c)  Landlord agrees to protect, defend, indemnify and save harmless Tenant from and against any and all liabilities, losses, damages, costs, expenses (including all reasonable attorneys' fees and expenses), occasioned by the gross negligence or willful misconduct of Landlord, its agents, employees, contractors, or invitees. Landlord shall not be liable to Tenant or to Tenant's employees, agents, or visitors for injury to person or damage to or loss of property on or about the Premises or any common area or limited common area appurtenant thereto, or for any injury or loss caused by the negligence or misconduct of Tenant officers, partners, employees, agents, sub-tenants, licensees, concessionaires, visitors or any other person entering into the Premises arising out of the use of the Premises by the Tenant and



Lease Agreement Revised 4-15-11.DOC

the conduct of the business thereon, or arising out of any breach or default by the Tenant in the performance of its obligations hereunder.

The provisions of this Section shall survive the termination of this Lease with respect to any claims or liability occurring prior to such termination.

8.6  Force Majeure.  The time for performance of obligations of Landlord and Tenant pursuant to this Lease shall be excused, for the period of the delay and the period for performance of any act or obligation shall be extended for a period equivalent to the period of any delay (with the exception of either Party's respective obligations to timely pay monies as and when they become due pursuant to this Lease), in the event that such Party is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Lease by reason of strike, other labor trouble, governmental action or inaction, controls or shortages of fuel, supplies, labor or materials, acts of God or any other cause, whether similar or dissimilar, beyond such Party's reasonable control for so long as such force majeure act has occurred, and continues to prevent the obligated party from performing any act or obligation required hereunder.

9.  **CONDEMNATION.**  If the whole of the Premises, or so much thereof as to render the balance unusable by Tenant, including the taking of all of the parking spaces serving the Premises or the blockage and closing of the access points from the adjoining public right of ways to the Premises, is taken under the power of eminent domain by any public or quasi-public authority then this Lease shall automatically terminate as of the date possession is taken by the condemning authority. No award for any total or partial taking shall be apportioned, and Tenant hereby unconditionally assigns to Landlord any award which may be made in such taking or condemnation. In the event of a partial taking, which does not result in the termination of this Lease, Base Rent and Proportionate Share shall be apportioned and recalculated according to the part of the Premises remaining usable by Tenant.

All compensation awarded or paid for any taking or acquiring under the power or threat of eminent domain, whether for the whole or a part of the Premises or Commercial Space, shall be the property of Landlord, whether such damages shall be awarded as compensation for diminution in the value of the leasehold or to the fee of the Premises or otherwise, and Tenant hereby assigns to Landlord all of the Tenant's right, title and interest in and to any and all such compensation; provided, however, that Landlord shall not be entitled to any award specifically made to Tenant for the taking of Tenant's trade fixtures, furniture or leasehold improvements to the extent of the cost to Tenant of said improvements (exclusive of Landlord's contribution), less depreciation computed from the date of said improvements to the expiration of the original term of this Lease (or Extended Term, if applicable).

10.  **ASSIGNMENT AND SUBLETTING.**

10.1  Transfer of Landlord's Interest:  Landlord shall have the right to sell, mortgage or otherwise dispose of Landlord's interest in the property subject to this Lease. Tenant shall, upon Landlord's request, execute and deliver any instrument necessary to cause this Lease to be subordinate to any mortgage or other instrument of security which may hereafter be placed on the Premises by Landlord. It being understood that such subordination is subject to such



succession in interest or lien holder should they take fee simple title to the Premises, shall attach to the rights of the Tenant therein, provided the Lease is in good standing and such successor shall have no liability for acts or failure to act by its predecessor "Landlord".

   10.2  <u>Transfer of Tenant's Interest:</u> Tenant may not assign this Lease in whole or in part, nor sublet all or any portion of the Premises without the prior written consent of the Landlord, which shall not be unreasonably withheld. If Tenant requests Landlord's consent to an assignment, Tenant will simultaneously with such request give Landlord (i) the name and address of the proposed assignee, (ii) the assignment review fee described below; and (iii) reasonably satisfactory and complete information about the nature, financial condition, business and business history of the proposed assignee, and its proposed use of the Premises. Without limiting the other instances in which it may be reasonable for Landlord to withhold its consent to a proposed assignment, it shall be reasonable for Landlord to withhold its consent to a proposed assignment if at the time of the proposed assignment Tenant shall be in default under this Lease beyond any applicable notice and grace period or if the net worth of the proposed assignee is not reasonably sufficient for it to meet its financial obligations under this Lease.

   Any such Assignee or Sublessee shall execute an assumption of the obligations of this Lease, and provide pertinent notice information as otherwise required hereunder and/or reasonably requested by the Landlord. The Tenant and/or its successors shall pay unto the Landlord a sum equal to the amount of $250.00 upon the request for the consent to any such assignment or subletting to cover its costs associated with the review of such application and the changing of its records accordingly.

   The consent by the Landlord to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. Nothing contained in any such assignment shall relieve the original Tenant and/or any guarantors hereunder of their obligations to the Landlord as security for the strict performance of the Tenant's obligations hereunder. If this Lease is assigned without the prior written consent of the Landlord, such assignment shall be *void ab initio*, and the Tenant in default under the terms hereof. If the Premises or any part thereof is sublet or occupied by any party other than the Tenant without the written consent of the Landlord, the Landlord may collect rent from the Assignee, sub-Tenant or occupant and apply the net amount collected to the Base Rent and additional rent and other sums due hereunder and the same shall not be deemed to be a waiver of the Landlord's right for the strict enforcement of the terms of this covenant or the declaration of a default by the Tenant for having failed to obtain such consent in writing.

   For the purposes hereof, any merger, consolidation or transfer by sale of stock or assignment of interest, inheritance or otherwise of more than twenty-five percent (25%) of the control of the Tenant from those Principals as described in this Lease, if the Tenant shall be corporation, partnership or trust, shall constitute an assignment of this Lease. This prohibition against assignment or subletting shall be construed to include prohibition against any assignment or subletting by operation of law, legal process, receivership, bankruptcy or otherwise, whether voluntary or involuntary, and a prohibition against any encumbrance of all or any part of the Tenant's leasehold interest.





      10.3   <u>Approved Transfer of Tenant's Interest</u>:    The provisions of Section 10.2 to the contrary notwithstanding, Tenant may assign this Lease to an entity whose management and operation is controlled by Tenant and which the Tenant is the majority owner.

## 11.   <u>DEFAULT</u>.

      11.1   <u>Tenant Default</u>. Tenant shall be in default under this Lease if any of the following events or acts shall occur (an "Event of Default"):

      (a) If Tenant fails to make any payment when due of Base Rent, Additional Rent or other sum required by the terms of this Lease to be paid by Tenant and such failure continues for five (5) days after the giving of written notice from Landlord to Tenant that the same is due and has not been received by Landlord; or

      (b) If Tenant fails to observe or perform any other provision of this Lease for fifteen (15) days after written notice from Landlord to Tenant specifying in detail the Event of Default (provided, that in the case of any default referred to in this Lease which cannot with diligence be cured within such fifteen (15) day period, if Tenant shall proceed promptly to cure the same and thereafter shall prosecute the curing of such default with diligence, then upon receipt by Landlord of a Tenant's Certificate stating the reason such default cannot be cured within fifteen (15) days and stating that Tenant is proceeding with due diligence to cure such default, the time within which such failure may be cured shall be extended for such period as may be necessary to complete the curing of the same with diligence); or

      (c) Tenant shall file a voluntary petition in bankruptcy or any Order for Relief be entered against it, or Tenant shall file any petition or answer seeking any arrangement, reorganization, composition, re-adjustment or similar relief under any present or future bankruptcy or other applicable law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Tenant of all or any substantial part of Tenant's properties; or,

      (d) If any creditor of Tenant shall file a petition in bankruptcy against Tenant or for reorganization of Tenant, under state or federal law, and if such petition is not discharged within sixty (60) days after the date on which it is filed; or,

      (e) Abandonment or vacating of the Premises and failing to operate the business of the Intended Use by the Tenant for a period of fifteen (15) consecutive days, unless closed temporarily for renovations or repairs and Tenant is paying Rent; or,

      (f) Tenant's interest under this Lease being sold or assigned under execution or other legal process; or,

      (g) Any of the goods or chattels of the Tenant used in or incident to the operation of the Tenant's business in the Premises being seized, sequestered, or impounded by virtue of or under authority of any legal proceedings, which seizure, sequestration or impounding shall, in the opinion of the Landlord materially affect the possible continuation of the operation of the Tenant's business in the Premises.




11.2    <u>Landlord's Remedies</u>. In the event of any such Event of Default Landlord may have any or all of the following options, such remedies being cumulative, including but not limited to those otherwise provided either at law or in equity:

(a)    In the event of any such Event of Default, the Landlord shall have the right to re-enter the Demised Premises, either by summary proceedings or otherwise, in accordance with Florida law, and remove all other occupants therefrom and dispose of all property therein in any manner provided by Florida law.  In such case, Landlord shall not be guilty of trespass or become liable for any loss or damage which may be occasioned thereby. The parties hereto agree that in the event that the Tenant has been dispossessed and is no longer in possession, or has abandoned the Premises for a period in excess of seven (7) days after an Event of Default, and personal property has been left at the Demised Premises by the Tenant, the Landlord shall give notice of the same to the Tenant in writing.  Failure by the Tenant to pick up and remove said personal property within seven (7) days of the date of delivery of said notice, it shall be irrebuttably presumed that the Tenant has abandoned said property, and that the value thereof is less than Two Hundred ($200.00) Dollars to the Tenant, and the Landlord shall be permitted to remove and dispose of such personalty.  In any of such events, the Landlord shall not be guilty of trespass or become liable for any loss or damage which may be occasioned thereby.

(b)    If an Event of Default shall have occurred and be continuing, Landlord shall have the right at its election to give Tenant twenty (20) days written notice of Landlord's intention to terminate the Term of this Lease on a date specified in such notice. Thereupon, the Term of this Lease and the estate hereby granted shall terminate on such date as completely and with the same effect as if such date were the date fixed in this Lease for the expiration of the Term of this Lease, and all rights of Tenant contained in this Lease shall terminate, but Tenant shall remain liable as provided in this Lease.

(c)    If an Event of Default shall have occurred and be continuing Landlord shall have the immediate right, whether or not the Term of this Lease shall have been terminated pursuant to Section 11.2(b), to (i) re-enter and repossess the Premises or any part of the Premises by any and all lawful means, and (ii) remove all persons and property from the Premises, Tenant hereby expressly waiving any and all notices to quit, cure or vacate provided by current or any future law.  Landlord shall be under no liability by reason of any such re-entry, repossession or removal.  No such re-entry or taking of possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate the Term of this Lease unless a written notice of such intention is given to Tenant pursuant to Section 11.2(b).

(d)    At any time or from time to time after the repossession of the Premises or any part of the Premises, whether or not the Term of this Lease shall have been terminated pursuant to Section 11.2(b), Landlord may (but shall be under no obligation to) relet the Premises or any part of the Premises for the account of Tenant, in the name of Tenant or Landlord or otherwise, without notice to Tenant, for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the Term of this Lease) and on such conditions (which may include concessions or free Rent) and for such uses Landlord, in its reasonable discretion, may determine, and Landlord may collect and receive any



Rents payable by reason of such reletting. Landlord shall not be liable for any failure to relet the Premises or any part of the Premises or for any failure to collect any Rent due upon any such reletting.

(e)    No termination of the Term of this Lease pursuant to Section 11.2(b), by operation of law or otherwise; no repossession of the Premises or any part of the Premises; and, no reletting of the Premises or any part of the Premises pursuant to Section 11.2(c), shall relieve Tenant of its liabilities and obligations pursuant to the terms of this Lease, all of which shall survive such expiration, termination, repossession or reletting.

11.3    Landlord's Default.  If Landlord should be in default in the performance of any of its obligations under this Lease, which default continues for a period of more than twenty (20) days after receipt of written notice from Tenant to Landlord specifying such default, or if such default is of a nature to require more than twenty (20) days for remedy and continues beyond the time reasonably necessary to cure (and Landlord has not undertaken procedures to cure the default within such twenty (20) day period and diligently pursued such efforts to complete such cure), in addition to any other remedy available at law or in equity at its option, upon written notice, Tenant may terminate this Lease.  Additionally, in the event of any "material default" by Landlord, Tenant may incur any expense necessary to perform the obligations of Landlord specified in any default notice pursuant to this Section 11.3 and deduct such expense from the Rent or other charges next becoming due.  As used in this Lease, a "material default" shall mean a default by Landlord, which prevents the Tenant from conducting its Intended Use at the Premises.

11.4    Attorneys' Fees.  If a Party commences an action against the other Party seeking to enforce any of the terms of this Lease, or because of the breach by any Party of any of the terms of this Lease, the losing Party shall pay to the prevailing Party its reasonable attorneys' fees, costs and expenses actually incurred in connection with the prosecution or defense of such action, including without limitation all such fees, costs and expenses incurred at trial, upon appeal, and in any bankruptcy or reorganization proceedings.

11.5    WAIVER OF TRIAL BY JURY. IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THE RESPECTIVE PARTIES HERETO SHALL AND HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS RELATING TO THE RENT DUE UNDER THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, AND TENANT'S USE OF OR OCCUPANCY OF THE PREMISES.

12    ACCESS BY LANDLORD.

12.1    Right of Entry.  Landlord or Landlord's agents and the Association shall have the right to enter the Premises at all times for emergency purposes.  Further, Landlord or Landlord's agents shall have the right to enter the Premises at all times to examine the same, and to show them to prospective purchasers or lessees of the building, and to make such repairs, alterations, improvements or additions as Landlord may deem necessary or desirable, at



reasonable times to not interfere with the business operation of the Tenant, and Landlord shall be allowed to take all material into and upon the Premises that may be required therefore without the same constituting an eviction of Tenant in whole or in part and the Rent reserved shall in no wise abate while such repairs, alterations, improvements or additions are being made, by reason of loss or interruption of business of Tenant, or otherwise. During the six (6) months prior to the expiration of the Lease Term or any renewal term, Landlord may exhibit the Premises to prospective tenants or purchasers, and place upon the Premises the usual notices "To Let" or "For Sale" which notices Tenant shall permit to remain thereon without molestation. If Tenant shall not be personally present to open and permit an entry into the Premises, at any time, when for any reason an entry to the Premises shall be necessary or permissible, as provided herein, Landlord or Landlord's agents may enter the same by a master key, without rendering Landlord or such agents liable therefore, and without in any manner affecting the obligations and covenants of this Lease. Nothing contained in this Lease, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever, for the care, maintenance or repair of the building or any part of the building, except as otherwise specifically provided in this Lease.

12.2 Excavation. If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter upon the Premises for the purpose of doing such work as Landlord shall deem necessary to preserve the wall or the building of which the Premises form a part from injury or damage and to support the same by proper foundations, without any claim for damages or indemnification against Landlord or diminution or abatement of Rent.

### 13. MISCELLANEOUS.

13.1 Notices. All notices, demands, requests, consents, approvals and other communications required or permitted pursuant to this Lease (a "Notice") must be in writing and will be deemed to have been duly given (a) upon the date of the Notice if delivered personally, or by electronic mail provided that a duplicate copy is promptly mailed by U.S. Mail, or by overnight courier which provides a receipt such as Federal Express; or (b) upon the date following the date of the Notice if delivered by overnight courier which provides a receipt, such as Federal Express. In each case, the Notice must have adequate postage prepaid, addressed to the appropriate Party and marked to a particular individual's attention as provided in this Section 13.1. The Notice will be effective upon being so deposited, but the time period in which a response to any Notice must be given or any action taken with respect to the Notice will commence to run from the date of receipt of the Notice by the addressee of the Notice as evidenced by the return receipt. Rejection or other refusal by the addressee to accept or the inability of the United States Postal Service or air courier service to deliver because of a changed address of which no Notice was given will be deemed to be the receipt of the Notice sent as of the Business Day following deposit. If either Party changes their address, that Party must notify the other Party of such change by Notice delivered in accordance with this Section 11.1. The initial addresses of the Parties are as follows:





If to Tenant:

Funky Monkey, Inc.
912 North Mills Avenue, Orlando, FL 32803
Attn: Edward L. Nickell
Telephone: 407-427-1447
Email:

With a copy to: **Jacqueline Bozzuto**
**Lowndes, Drosdick, Doster, Kantor &**
**Reed, P.A.**
**215 North Eola Drive**
**Orlando, Florida 32801**
**407.418.6207 - Direct**
**407.843.4600 - Office**
**407.843.4444 - Fax**
Jackie.Bozzuto@lowndes-law.com

If to Landlord:

My Property Holdings LLC
c/o John P. Wilkes, Esq.

901 S. Federal Highway, Suite 101A, Fort
Lauderdale, FL 33316
Telephone: (954) 467-9200
Email: jwilkes@jpwpa.com

With a copy to:

13.2    Estoppel Certificates. From time to time, upon not less than ten (10) days prior written request by either Party, Tenant and Landlord will execute, acknowledge and deliver to the requesting Party a Certificate certifying: (i) that this Lease is unmodified and in full force and effect (or setting forth any modifications along with the statement that this Lease as modified is in full force and effect); (ii) the dates to which the Base Rent, Additional Rent and other sums payable pursuant to the terms of this Lease have been paid; (iii) that to the knowledge of Tenant, Landlord is not in any default of this Lease (or specifying any alleged default if Tenant has any such knowledge); (iv) that to the knowledge of Landlord, Tenant is not in any default of this Lease (or specifying any alleged default if Landlord has any such knowledge); (v) the commencement and expiration dates of this Lease; (vi) the amount of advance Rents paid by Tenant, if any; (vii) that either Tenant is in possession of the Premises or who is in possession; (viii) any concessions or other rights that Tenant may have (including without limitation extension options) or that Landlord may have; and (ix) such other matters as may reasonably be required by the requesting Party. Any such certificate may be relied upon by any mortgagee, prospective purchaser, prospective mortgagee of the Premises, prospective assignee of Tenant's rights or prospective subtenant. In the event that the Tenant has not provided the estoppels required herein, the Landlord shall be deemed to be its Attorney-in-Fact and may execute the Estoppel Certificate on behalf of the Tenant without liability and the Tenant shall be bound by the terms thereof.




13.3    <u>Surrender; Holding Over</u>.  Upon the termination of this Lease, Tenant shall peaceably surrender the Premises to Landlord in the same condition in which the Premises were received by Tenant from Landlord at the commencement of this Lease, normal wear, tear, depreciation and obsolescence excepted, and except as altered as permitted or required by this Lease.  Tenant shall remove from the Premises prior to such termination all of Tenant's Property and repair any damage caused by such removal.  Tenant's Property not so removed shall become the property of Landlord as provided hereinabove.  Landlord may thereafter cause such Tenant Property to be removed and disposition of and the cost of repairing any damage caused by such removal shall be borne by Tenant.

Any holding over by Tenant of the Premises after the expiration or earlier termination of the Term of this Lease or any Extended Term, with the consent of Landlord, shall be in writing, operate and be construed as a tenancy from month to month only, at one hundred twenty-five percent (125%) of the Base Rent for the prior Lease Year and upon the same terms and conditions as contained in this Lease.

Any holding over by the Tenant of the Premises after the expiration or earlier termination of the term of the Lease or any extended term, without the consent  of the Landlord, will be deemed to be a holdover tenancy, and the rents due for such period shall be at a rate equal to twice the amounts due for the prior ensuing period, in accordance with Florida Statute Sec. 83.06, and as the same may be amended from time to time hereafter without the necessity of the Landlord providing additional written notice of its rights to exercise the provision of said statute.

13.4    <u>Savings Clause</u>.  If any term or provision of this Lease or the application thereof to any person or circumstances or at any time to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances or at any time other than those to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

13.5    <u>Binding Effect</u>.    All of the covenants, conditions and  obligations contained in this Lease shall be binding upon and inure to the benefit of the respective successors and assigns of Landlord and Tenant to the same extent as if each successor and assign were in each case named.

13.6    <u>Table of Contents and Headings</u>.  The table of contents and headings used in this Lease are for convenience of reference only and shall not to any extent have the effect of modifying, amending or changing the provisions of this Lease.

13.7    <u>Governing Law</u>.  This Lease shall be governed by and interpreted under the laws of the state of Florida.  Venue shall lie in the Circuit Court in Orange County, Florida, or in the Federal District Court for the Middle District of Florida.

13.8    <u>Integration</u>.  This Lease, the exhibits to this Lease and the memorandum constitute the entire agreement between the Parties with regard to the subject matter of this Lease, and supersede any prior understandings, agreements or negotiations.  This Lease may not be amended or modified except by a writing executed by Tenant and Landlord.



13.9    Subordination to Financing.

a)    Tenant agrees that this Lease shall at all times be subject to and subordinate to the lien of any Mortgage placed upon the Commercial Space by the Landlord, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination.

b)    Tenant shall attorn and be bound to any of Landlord's successors under all of the terms, covenants, and conditions of this Lease for the balance of the remaining Lease Term.

c)    Notwithstanding any contained in subparagraphs a and b hereinabove to the contrary, provided the Tenant's obligations under the Lease are otherwise in good standing and Tenant is not in default thereunder.   In the event of a foreclosure or other enforcement of any mortgage, or conveyance or sale in lieu of such default, the purchaser at such foreclosure sale shall be bound to recognize rights of the Tenant for the balance of the term of this Lease, provided, any such successor interest shall not be bound by nor liable to the Tenant for any obligation for a predecessor or landlord hereunder.

d)    The Tenant agrees that, if requested by a Mortgagee for the purpose of enforcement of subparagraph c above, it shall execute without charge or delay a Subordination, Non-Disturbance and Attornment Agreement in form reasonably requested by the Lender.

13.10    Broker.   Each Party hereby represents and warrants to each other that, neither Party has consulted or negotiated with any broker or finder with regard to this Lease or the Premises, except Old Town Brokers, Inc., who will be paid a total fee equal to $29,681.00, by the Landlord as follows:

a)    $14,840 upon the Lease being fully executed, deposits and all pre-paid rents, etc., delivered, and conditions precedent waived and/or satisfied; and

b)    The balance of $14,840.00 to be paid upon receipt by the Landlord of the first month's rent and Tenant having completed all improvements, taking occupancy, and opening of business.

Landlord shall indemnify and hold Tenant harmless from all damages, judgments, liabilities and expenses (including attorneys' fees) arising from any other claims or demands of any broker, agent or finder with whom Landlord has dealt, for any fees or commissions alleged to be due in connection with its participation in the procurement or negotiation of this Lease.   Similarly, Tenant shall indemnify and hold Landlord harmless from all damages, judgments, liabilities and expenses (including reasonable attorneys' fees) arising from any other claims or demands of any broker, agent or finder with whom Tenant has dealt for any fees or commissions alleged to be due in connection with its participation in the procurement or negotiation of this Lease.

13.11    Radon Gas.   Pursuant to Florida Statutes, Section 404.056[7], the following disclosure is required by law:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons



who are exposed to it over time.  Levels of Radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding Radon testing may be obtained from your county public health unit.

13.12 <u>Memorandum of Lease</u>.  Landlord and Tenant hereby agree that under no circumstances shall this Lease be filed in the Public Records maintained by any governmental authority without the express written consent of both Parties, except for the enforcement of the terms hereof in litigation.  However, Landlord, at its option may elect to have executed and prepared a Memorandum of Lease setting forth a description of the Premises, the Term of this Lease and any other portions of the Lease, excepting the rental provisions, as may be reasonably appropriate, including reference to limitations of liability of the Landlord for any obligations of the Tenant with regard to improvements or operation of the Premises.  Landlord, at Landlord's expense, shall file the executed Memorandum of Lease in the public records maintained by the appropriate governmental authority having jurisdiction over real property records.

13.13 <u>Interpretation</u>:    Irrespective of the place of execution of performance, this Lease shall be construed and interpreted without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.  Both parties have had or had notice to acquire legal counsel with regard to the content hereof and are fully versed in the terms and conditions as contained herein.

13.14 <u>Counter-Parts</u>:    This lease may be executed in any number of counter-parts, each of which shall be an original, but all of which shall together constitute one (1) Lease.

## 14. <u>SPECIAL CLAUSES:</u>

14.1 <u>Tenant Improvement Credit:</u>  In order to provide the Tenant ample time to complete all of the work required for Tenant's Work in a timely fashion, the Landlord has delayed the Rent Commencement Date of the Lease as provided in paragraph 3.1 above.

14.2 <u>Guaranty:</u>  The Lease shall be guaranteed by: Edward L. Nickell and Nicolas Olivieri, a form of the Guaranty is attached hereto and made a part hereof as Exhibit "E".

[SIGNATURE PAGE TO FOLLOW]



IN WITNESS WHEREOF, the Parties have executed this Lease as of the day and year first above set forth.

Signed, sealed and delivered                    "LANDLORD"
in the presence of:

                                                MY PROPERTY HOLDINGS, LLC

Name: _Jean T. Sherman_                         By: _____
                                                Name: _Stephen Rupp_
Name: _Kimberly J. Simon_                       Title: _Manager_


STATE OF FLORIDA        )
                        ) SS
COUNTY OF BROWARD)

        The foregoing instrument was acknowledged before me this _____ day of _____,
2011, by _____, as the _____ of MY PROPERTY HOLDINGS,
LLC, on behalf of the company, who is personally known to me or has produced
_____ as identification.

(NOTARIAL SEAL)
                                    _____
                                    NOTARY PUBLIC

                                    _____
                                    Print Name
                                    State of _____
My Commission Expires: _____

"TENANTS"

FUNKY MONKEY, INC.

Name: _SueBee Paginess_

Name: _Maria Blanchard_

By: _Edward Nickell_

Name:  Edward L. Nickell, President

STATE OF FLORIDA    )
                    ) SS
COUNTY OF _Orange_  )

    The foregoing instrument was acknowledged before me this _15_ day of _April_, 2011, by Edward L. Nickell as President of Funky Monkey, Inc., a Florida corporation, such person is personally known to me or has produced _FL Driver License_ as identification.

(NOTARIAL SEAL)

NOTARY PUBLIC-STATE OF FLORIDA
Donna J. Vogler
Commission #DD1000382
Expires:  JUNE 10, 2014
BONDED THRU ATLANTIC BONDING CO, INC.

_Donna J. Vogler_
NOTARY PUBLIC

_Donna J. Vogler_
Print Name
State of Florida
My Commission Expires: _June 10, 2014_

Exhibit "A"

# The Sanctuary Downtown, A CONDOMINIUM

## LEVEL 1
## FLOOR PLAN
### REVISED DECEMBER 17, 2010



**LEGEND:**

- ▨ UNIT
- ▧ RESIDENTIAL LIMITED COMMON ELEMENT
- ☐ COMMON ELEMENT
- ■ COMMERCIAL LIMITED COMMON ELEMENT

- ⓐ TRASH ROOM
- ⓑ SECURITY OFFICE
- ⓒ FIRE COMMAND/CONTROL ROOM
- ⓓ MECHANICAL ROOM
- ⓔ GENERATOR ROOM
- ⓕ FIRE PUMP ROOM
- ⓖ TRANSFORMER VAULT
- ⓗ ELECTRICAL ROOM
- ⓘ TRASH COMPACTOR ROOM
- ⓙ WATER PUMP ROOM
- ⓚ MAIN LOBBY
- ⓛ ELEVATOR LOBBY ONE
- ⓜ ELEVATOR LOBBY TWO
- ⓝ LOBBY RESTROOM
- ⓞ MAIL ROOM
- ⓟ COMMERCIAL ELEVATOR LOBBY
- ⓠ STORAGE ROOM
- ▬▬▬ BOUNDARY LINE

1. ALL AREAS AND IMPROVEMENTS, EXCLUSIVE OF THE UNITS ARE COMMON ELEMENTS OF THE CONDOMINIUM.

2. ALL STRUCTURAL FEATURES (COLUMNS, ETC.,) ARE COMMON ELEMENTS OF THE CONDOMINIUM.

3. ALL IMPROVEMENTS SHOWN ARE PROPOSED.

4. PARKING SPACES ARE LIMITED, COMMON ELEMENTS WHICH HAVE BEEN DESIGNATED AND ASSIGNED FOR EXCLUSIVE USE BY RESIDENTIAL OR COMMERCIAL UNIT OWNERS IN ACCORDANCE WITH SECTION 3.3.4 OF THE DECLARATION.

**ASM**
AMERICAN SURVEYING & MAPPING
200 EAST SOUTH STREET  SUITE 100 • ORLANDO, FLORIDA 32801
(407) 426-7979

PAGE 3 OF 46

Exhibit 1



# The Sanctuary Downtown, A CONDOMINIUM

## COMMERCIAL UNIT 3A AND COMMERCIAL UNIT 3B
## FLOOR PLAN
### REVISED DECEMBER 17, 2010

UNIT C-3A

UNIT C-3B

AMERICAN SURVEYING & MAPPING
320 EAST SOUTH STREET  SUITE 180 • ORLANDO, FLORIDA 32801
(407) 426-7979

*PAGE 44 OF 46*

## UNDIVIDED SHARE OF THE COMMON ELEMENTS, COMMON EXPENSES, COMMON SURPLUS AND SQUARE FOOTAGE OF UNITS

| UNIT NUMBERS | SHARE OF COMMON ELEMENTS, COMMON EXPENSES AND COMMON SURPLUS PER INDIVIDUAL UNIT | SQUARE FOOTAGE PER INDIVIDUAL UNIT |
|---|---|---|
| 501, 801, 701, 801, 901, 1001, 1101, 1201, 1401, 1501, 1601, 1701 | 0.54% | 2,120 |
| 502, 602, 702, 802, 902, 1002, 1102, 1202, 1402, 1502, 1602, 1702 | 0.45% | 1,755 |
| 503, 603, 703, 803, 903, 1003, 1103, 1203, 1403, 1503, 1603, 1703 | 0.34% | 1,325 |
| 504, 604, 704, 804, 904, 1004, 1104, 1204, 1404, 1504, 1604, 1704 | 0.34% | 1,325 |
| 505, 605, 705, 805, 905, 1005, 1105, 1205, 1405, 1505, 1605, 1705 | 0.52% | 2,005 |
| 506, 606, 706, 806, 906, 1006, 1106, 1206, 1406, 1506, 1606, 1707 | 0.66% | 2,575 |
| 507, 607, 707, 807, 907, 1007, 1107, 1207, 1407, 1507, 1607, 1707 | 0.51% | 1,970 |
| 508, 608, 708, 808, 908, 1008, 1108, 1208, 1408, 1508, 1608, 1708 | 0.41% | 1,600 |
| 509, 609, 709, 809, 909, 1009, 1108, 1208, 1409, 1509, 1609, 1709 | 0.52% | 2025 |
| 510, 610, 710, 810, 910, 1010, 1110, 1210, 1410, 1510, 1610, 1710 | 0.64% | 2475 |
| 511, 711, 811, 911, 1011, 1111, 1211, 1411, 1511, 1611, 1711, | 0.54% | 2100 |
| 512, 712, 812, 912, 1012, 1112, 1212, 1412, 1512, 1612, 1712, | 0.36% | 1400 |
| 513, 713, 813, 913, 1013, 1113, 1213, 1413, 1513, 1613, 1713, | 0.48% | 1845 |
| 514, 814, 714, 814, 1014, 1114, 1214, 1414, 1514, 1614, 1714, | 0.53% | 2040 |
| PH-115, PH-215 | 0.98% | 3830 |
| PH-116, PH-216 | 0.64% | 2490 |
| PH-117, PH-217 | 1.04% | 4050 |
| PH-118, PH-218 | 0.85% | 3323 |
| PH-119, PH-219 | 1.09% | 4244 |
| PH-120, PH-220 | 1.23% | 4800 |
| COMMERCIAL UNIT 1 | 1.71% | 6668 |
| COMMERCIAL UNIT 2 | 0.81% | 3166 |
| COMMERCIAL UNIT 3 Revised Dec 17, 2010 | 1.63% | 6353 |
| COMMERCIAL UNIT 4 | 2.40% | 13235 |

Commercial unit 3A    0.66%    2577

Commercial unit 3B    0.97%    3776

EXHIBIT D TO DECLARATION

Exhibit 1

EXHIBIT "B"
To Lease

## ASSIGNMENT OF INTEREST IN PARKING SPACE

### RECITALS:

WHEREAS, Landlord ( sometimes referred to as "Assignor") is the owner of Unit C-3 of THE SANCTUARY DOWNTOWN, A CONDOMINIUM, located in Orange County, Florida; and

WHEREAS, Landlord is the assignee of the right to use the following enclosed parking spaces 1021-1032, 1034, 1035 AND 1052, located on the first floor of the Condominium as depicted on Exhibit A -1 attached hereto  (the "Parking Spaces"). The Enclosed Parking Spaces are designated as a Limited Common Element under, and governed by, the Declaration;

WHEREAS, Tenant ( sometimes referred to as  "Assignee") is on even date herewith acquiring a leasehold interest to a portion of Unit C-3 pursuant to a lease to which this Assignment is attached as an Exhibit ("Lease"); and

WHEREAS, Landlord has agreed to assign to Tenant the right to use the Parking Space during the term of the Lease, upon the terms set forth below.

NOW, THEREFORE, for and in consideration of the sum of TEN ($10.00) DOLLARS, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledge, the parties agree as follows:

1.    Recitals. The above recitals are true and correct and form a material part of this Assignment.

2.    Assignment of Parking Spaces . Assignor hereby grants, bargains, sells, assigns, and transfers to Assignee its right, title, and interest to use the Parking Spaces as long as the Lease is in full force and effect, and the Tenant is not in default thereunder.

3.    Rules and Regulations of S.C.O. CONDOMINIUM ASSOCIATION, INC. The use of the Parking Spaces is subject to rules and regulations promulgated by S.C.O. CONDOMINIUM ASSOCIATION, INC. (the "Association"), and all terms and provisions set forth in the Declaration.  Assignee agrees to comply with all rules and regulations governing the Parking Spaces.

1

4.    Further Assignment by Assignee Prohibited.  Assignee shall not be able to assign the right use the Parking Spaces.  The Association shall be provided with notice of this Assignment.

5.    Use of Parking Spaces.

A.    Assignee agrees that only reasonable and customary use will be made of the Parking Spaces covered hereby, and that no unnecessary wear and tear, disturbance, nuisance, rubbish or garbage will be permitted on the Parking Spaces or adjacent facilities or premises.  Assignee agrees to keep the Parking Spaces and adjacent premises free and clear of gear, tackle and other obstructions, and Assignee will dispose of all rubbish and garbage in appropriate containers.  Assignee shall be responsible for the conduct and actions of his or her guests.

6.    Damages and Insurance.  Assignor and the Association will not be responsible for any injuries and property damage caused by or arising out of the use of the Parking Spaces.  The use of all of the Parking Spaces is entirely at the risk of Assignee, as to theft, fire, vandalism and other Acts of God.  Assignor and the Association do not maintain insurance covering the personal property of Assignee.  It is the responsibility of Assignee to adequately insure its property.

7.    No Liability for Damages.    Assignor and S.C.O. CONDOMINIUM ASSOCIATION, INC., their employees or agents shall not be responsible for any injuries, including death, or property damage resulting from, caused by, or arising out of the use of the Parking Spaces.  Assignee releases and discharges Assignor and the Association from any and all liability from loss, injury or damages to persons or property sustained while in or on the Parking Spaces.

8.    Miscellaneous.

(a)    Execution by Parties.  This Assignment shall not become effective until the Lease has been executed by all of the parties hereto.

(b)    Applicable Law.  This Assignment shall be construed under the laws of the State of Florida.

(c)    Time of the Essence.  Time is of the essence.

(d)    Binding Effect Upon Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of, respectively, the parties, their successors, legal representatives, grantees and assigns, as applicable and appropriate.

2

(e)    Severability. If any term of this Assignment shall be held to be invalid, illegal, or unenforceable, the validity of the other terms of this Assignment shall in no way be affected thereby.

(f)    Counterparts. Specifically Deleted.

(g)    Attorneys' Fees. If it becomes necessary for either party herein, their successors or assigns, or the Association, to seek legal means to enforce the terms of this Assignment, the non-prevailing party will be liable for all reasonable attorneys' fees, collection costs, travel expenses, deposition costs, expert witness expenses and fees, and any other cost of whatever nature reasonably and necessarily incurred by the prevailing party as a necessary incident to the prosecution or defense of such action plus court costs in all proceedings, trials and appeals.

(h)    Waiver. No waiver of any breach of this Assignment shall be held to be a waiver of any other or subsequent breach. All remedies afforded in this Assignment shall be taken and construed as cumulative, and in addition to every other remedy provided therein or by law. The failure of either party to enforce at any time any of the provisions of this Assignment, or to exercise any option which is herein provided, or to require at any time performance by the other party of any of the provisions hereof, shall in no way be construed to be a waiver or create an estoppel from enforcement of such provisions, nor in any way to affect the validity of this Assignment or any part thereof, or the right of either party to thereafter enforce each and every such provision, or to seek relief as a result of the prior breach.

(i)    Total Agreement. This Assignment contains the entire understanding of the parties and supersedes all previous verbal and written agreements. There are no other agreements, representations or warranties not set forth herein.

Initial: Tenant: _____          Landlord: _____
        Date: _____            Date: _____

3



Exhibit "C"

Inventory
Unit 105 (f/k/a Graze)

| Item: | | Quantity: |
|---|---|---|
| Different size skillets | | 67 |
| Coffee cups | | 22 |
| Coffee saucers | | 32 |
| Small coffee/tea cups | | 8 |
| Small saucers | | 32 |
| Creamer containers | | 25 |
| Soup bowls/saucers | | 32 |
| Small bowls | | 9 |
| Sugar/sweetner pack containers | | 11 |
| Salt & pepper shakers | | 11 |
| Small saucers | | 9 |
| Large plates | | 2 |
| Large bowls | | 2 |
| Milk/creamer containers | | 1 |
| Plastic teaspoons | | 50 |
| Stainless creamer containers | | 21 |
| Stainless napkin holders | | 12 |
| Lobster shell crackers | | 11 |
| Spoons | | 30 |
| Small knives | | 88 |
| Wine glasses (different sizes) | | 51 |
| Metal containers (difference sizes) | | 44 |
| Plastic food containers | | 27 |
| Plastic ketchup/mustard containers | 32 oz. | 12 |
| | 24 oz. | 12 |

Unit 105 Inventory
Page Two

| | |
|---|---|
| Oven/range Id No. CO7712 | 1 |
| Deep fryer serial number 0607MB0080 | 1 |
| Oven/range Id No. 00714 | 1 |
| Oven/range with flat cooking surface Id No. 007716 | 1 |
| Refrigerator serial number 14616964 | 1 |
| Wall mount ice maker serial number unknown | 1 |
| Food warming table with 5 warming trays and 6 warming drawers and 2 warming trays with covers | 1 |
| Vulcan food warmer serial number 27-1160141 | 1 |
| Range/oven Id. No. 007715 | 1 |
| Range hood part no. 12868 | 1 |
| Stainless food work table w/no Id No. | 1 |
| Dishwasher serial number 170587 w/attached garbage disposal and 2 attached work tables with sinks | 1 |
| Food tray racks with 14 food trays | 2 |
| Culligan water softener | 1 |

\\SERVER\E\WORK\My Property Holdings LLC\Unit C-3\Inventory Unit 105.wpd

Inventory
Unit 104 (f/k/a Fifi's)

| Item: | Quantity: |
|---|---|
| **Kitchen Area -** | |
| Deep fryer | 1 |
| Counter top microwave | 1 |
| Wall mount ice keeper | 1 |
| Stove with oven and grill | 1 |
| Flat surface cook top | 1 |
| Grill surface cook top | 1 |
| Refrigerator | 1 |
| Two drawer food warmers | 2 |
| Built in dishwasher and disposal | 1 |
| Counter top toaster | 1 |
| Stainless steel food prep table with 2-two drawer food warmers and 5 oven top warming areas | 5 |
| Counter top waffle maker | 2 |
| **Bar Area -** | |
| Under counter built-in food and drink cooler | 3 |
| Floor mount display food and drink cooler | 2 |
| **Dishes and Silverware -** | |
| Large skillets | 8 |
| Small skillets | 9 |
| Flat warming trays | 9 |
| Warming pans | 11 |
| Large dinner plates | 68 |
| Square serving plates | 35 |
| Regular dinner plates | 76 |
| Handles serving plates | 23 |
| Sanctuary Diner labeled coffee cups | 46 |
| Other coffee cups | 28 |
| Saucers | 100 |
| Drinking glasses | 27 |
| Teaspoons | 19 |
| Tablespoons | 11 |
| Small forks | 16 |
| Large forks | 147 |
| Knives | 154 |

Unit 104 - Inventory
Page Two


| | |
|---|---|
| Dining room tables | 17 |
| Dining room chairs | 44 |
| Dining room bar chairs | 6 |
| | |
| Office Desk | 1 |
| Office chairs | 2 |

EXHIBIT "D"

TENANT'S WORK

*Exhibit E*

## LEASE GUARANTY AGREEMENT

WHEREAS, **MY PROPERTY HOLDINGS, LLC.**, a Florida Limited Liability Company. as Landlord, and **FUNKY MONKEY, INC, a Florida corporation**, as Tenant, negotiated a Lease effective the _____ day of **April, 2011**, for that certain Premises located at CU-3 of the Sanctuary a Condominium. 100 S Eola Dr. , Orlando, FL 32801 ("Lease") (this Guaranty Agreement being attached as an exhibit to said Lease which is executed contemporaneously herewith), and

WHEREAS, the undersigned have requested Landlord to execute and deliver said Lease on the condition that the undersigned execute this Agreement as Guarantors; and

WHEREAS, the undersigned have agreed to execute this Guaranty in order to induce the Landlord to execute and deliver the aforesaid Lease:

NOW THEREFORE, The undersigned (jointly and severally, if more than one) ("Guarantor") in consideration of the execution and delivery of the aforesaid Lease by the Landlord, and for other valuable consideration, receipt of which is hereby acknowledged by the Guarantor, it is agreed as follows:

1.      The undersigned Guarantor, jointly and severally, do hereby guarantee to the Landlord and to any mortgagee holding a mortgage upon the interest of Landlord in the Leased Premises, the due and punctual payment of all rent payable under said lease, and each and every installment thereof, as well as the full and prompt and complete performance by the Tenant of all and singular the covenants, conditions and provisions in said Lease contained on the part of the Tenant therein to be kept observed and performed, for the full Term of said Lease and any extension thereof, as permitted by Lease with no less force and effect than if the undersigned were named as the Tenant in said Lease, and the undersigned jointly and severally will forthwith on demand pay all amounts at any time in arrears, and will make good any and all defaults occurring under said Lease.

2.      This Guaranty shall be absolute, continuing and unlimited, and the Landlord shall not be required to take any proceedings against the Tenant, or give any notice to the undersigned before the Landlord has the right to demand payment or performance by the undersigned upon default by the Tenant. This Guaranty and the liability of the undersigned hereunder shall in no way be impaired or affected by any assignment which may be made of said Lease, or any subletting thereunder, or by any extension(s) of the payment of any rental or any other sums provided to be paid by Tenant, or by any forbearance or delay in enforcing any of the terms, conditions, covenants or provisions of said Lease or any amendment, modification or revision of said Lease.

3.      No action or proceeding brought or instituted under this Guaranty against the undersigned, and no recovery had in pursuance thereof shall be any bar or defense to any further action or proceeding which may be brought under this Guaranty by reason of any further default or defaults of Tenant.

Page 1 of 2

4.    The liability of the undersigned shall not be deemed to be waived, released, discharged, impaired or affected by reason of the release or discharge of the Tenant in any creditors, receivership, bankruptcy (including Chapter X or Chapter XI bankruptcy proceedings or other reorganization proceedings under the Bankruptcy Act) or other proceedings, or the rejection or disaffirmance of the Lease in any proceedings.

5.    There shall be no modification of the provisions of this Guaranty unless the same be in writing and signed by the undersigned and the Landlord.

6.    All of the terms, agreements and conditions of this Guaranty shall be joint and several, and shall extend to and be binding upon the undersigned, their heirs, executors, administrators, and assigns and shall inure to the benefit of the Landlord, its successors, and assigns, and to any future owner of the fee of the premises referred to in the Lease, and to any mortgage on the fee interest of the Landlord in the Premises.

IN WITNESS WHEREOF, the undersigned Guarantor has(have) hereunto set his(their) signature(s) and seals on the _____ day of _____, 2011.

Name: N EDWARD L. NICKELL            Name: NICOLAS OLIVIERI
Address:_____            Address: _____

Phone #: (Cell) _____      Phone #: (Cell) _____
Email: _____              Email: _____
Social Security # _____    Social Security # _____

Driver's License(s) [Attach Copy]    Driver's License(s) [Attach Copy]

## ASSIGNMENT OF INTEREST IN PARKING SPACE

### RECITALS:

WHEREAS, Landlord ( sometimes referred to as "Assignor") is the owner of Unit C-3 of THE SANCTUARY DOWNTOWN, A CONDOMINIUM, located in Orange County, Florida; and

WHEREAS, Landlord is the assignee of the right to use the following enclosed parking spaces 1021-1032, 1034, 1035 AND 1052, located on the first floor of the Condominium as depicted on Exhibit A -1 attached hereto  (the "Parking Spaces"). The Enclosed Parking Spaces are designated as a Limited Common Element under, and governed by, the Declaration;

WHEREAS, Tenant ( sometimes referred to as  "Assignee") is on even date herewith acquiring a leasehold interest to a portion of Unit C-3 pursuant to a lease to which this Assignment is attached as an Exhibit ("Lease"); and

WHEREAS, Landlord has agreed to assign to Tenant the right to use the Parking Space during the term of the Lease, upon the terms set forth below.

NOW, THEREFORE, for and in consideration of the sum of TEN ($10.00) DOLLARS, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledge, the parties agree as follows:

1.    Recitals.  The above recitals are true and correct and form a material part of this Assignment.

2.    Assignment of Parking Spaces .  Assignor hereby grants, bargains, sells, assigns, and transfers to Assignee its right, title, and interest to use the Parking Spaces as long as the Lease is in full force and effect, and the Tenant is not in default thereunder.

3.    Rules and Regulations of S.C.O. CONDOMINIUM ASSOCIATION, INC.  The use of the Parking Spaces is subject to rules and regulations promulgated by S.C.O. CONDOMINIUM ASSOCIATION, INC. (the "Association"), and all terms and provisions set forth in the Declaration.  Assignee agrees to comply with all rules and regulations governing the Parking Spaces.

1

4.    <u>Further Assignment by Assignee Prohibited</u>.  Assignee shall not be able to assign the right use the Parking Spaces.  The Association shall be provided with notice of this Assignment.

5.    <u>Use of Parking Spaces</u>.

A.    Assignee agrees that only reasonable and customary use will be made of the Parking Spaces covered hereby, and that no unnecessary wear and tear, disturbance, nuisance, rubbish or garbage will be permitted on the Parking Spaces or adjacent facilities or premises.  Assignee agrees to keep the Parking Spaces and adjacent premises free and clear of gear, tackle and other obstructions, and Assignee will dispose of all rubbish and garbage in appropriate containers.  Assignee shall be responsible for the conduct and actions of his or her guests.

6.    <u>Damages and Insurance</u>.  Assignor and the Association will not be responsible for any injuries and property damage caused by or arising out of the use of the Parking Spaces.  The use of all of the Parking Spaces is entirely at the risk of Assignee, as to theft, fire, vandalism and other Acts of God.  Assignor and the Association do not maintain insurance covering the personal property of Assignee.  It is the responsibility of Assignee to adequately insure its property.

7.    <u>No Liability for Damages</u>.    Assignor and S.C.O. CONDOMINIUM ASSOCIATION, INC., their employees or agents shall not be responsible for any injuries, including death, or property damage resulting from, caused by, or arising out of the use of the Parking Spaces.  Assignee releases and discharges Assignor and the Association from any and all liability from loss, injury or damages to persons or property sustained while in or on the Parking Spaces.

8.    <u>Miscellaneous</u>.

(a)    <u>Execution by Parties</u>.  This Assignment shall not become effective until the Lease has been executed by all of the parties hereto.

(b)    <u>Applicable Law</u>.  This Assignment shall be construed under the laws of the State of Florida.

(c)    <u>Time of the Essence</u>.  Time is of the essence.

(d)    <u>Binding Effect Upon Successors and Assigns</u>.  This Assignment shall be binding upon and inure to the benefit of, respectively, the parties, their successors, legal representatives, grantees and assigns, as applicable and appropriate.

2

(e)    Severability. If any term of this Assignment shall be held to be invalid, illegal, or unenforceable, the validity of the other terms of this Assignment shall in no way be affected thereby.

(f)    Counterparts. Specifically Deleted.

(g)    Attorneys' Fees. If it becomes necessary for either party herein, their successors or assigns, or the Association, to seek legal means to enforce the terms of this Assignment, the non-prevailing party will be liable for all reasonable attorneys' fees, collection costs, travel expenses, deposition costs, expert witness expenses and fees, and any other cost of whatever nature reasonably and necessarily incurred by the prevailing party as a necessary incident to the prosecution or defense of such action plus court costs in all proceedings, trials and appeals.

(h)    Waiver. No waiver of any breach of this Assignment shall be held to be a waiver of any other or subsequent breach. All remedies afforded in this Assignment shall be taken and construed as cumulative, and in addition to every other remedy provided therein or by law. The failure of either party to enforce at any time any of the provisions of this Assignment, or to exercise any option which is herein provided, or to require at any time performance by the other party of any of the provisions hereof, shall in no way be construed to be a waiver or create an estoppel from enforcement of such provisions, nor in any way to affect the validity of this Assignment or any part thereof, or the right of either party to thereafter enforce each and every such provision, or to seek relief as a result of the prior breach.

(i)    Total Agreement. This Assignment contains the entire understanding of the parties and supersedes all previous verbal and written agreements. There are no other agreements, representations or warranties not set forth herein.

Initial: Tenant: _____          Landlord: _____
        Date: _____              Date: _____

3

# The Sanctuary Downtown, A CONDOMINIUM

### LEVEL 1
### FLOOR PLAN
REVISED DECEMBER 17, 2010



**LEGEND**

- ▨ UNIT
- ▨ RESIDENTIAL LIMITED COMMON ELEMENT
- ☐ COMMON ELEMENT
- ▦ COMMERCIAL LIMITED COMMON ELEMENT

- ⓐ TRASH ROOM
- ⓑ SECURITY OFFICE
- ⓒ FIRE COMMAND/CONTROL ROOM
- ⓓ MECHANICAL ROOM
- ⓔ GENERATOR ROOM
- ⓕ FIRE PUMP ROOM
- ⓖ TRANSFORMER VAULT
- ⓗ ELECTRICAL ROOM
- ⓘ TRASH COMPACTOR ROOM
- ⓙ WATER PUMP ROOM
- ⓚ MAIN LOBBY
- ⓛ ELEVATOR LOBBY ONE
- ⓜ ELEVATOR LOBBY TWO
- ⓝ LOBBY RESTROOM
- ⓞ MAIL ROOM
- ⓟ COMMERCIAL ELEVATOR LOBBY
- ⓠ STORAGE ROOM
- — — — BOUNDARY LINE

1. ALL AREAS AND IMPROVEMENTS, EXCLUSIVE OF THE UNITS ARE COMMON ELEMENTS OF THE CONDOMINIUM.

2. ALL STRUCTURAL FEATURES (COLUMNS, ETC.,) ARE COMMON ELEMENTS OF THE CONDOMINIUM.

3. ALL IMPROVEMENTS SHOWN ARE PROPOSED.

4. PARKING SPACES ARE LIMITED, COMMON ELEMENTS WHICH HAVE BEEN DESIGNATED AND ASSIGNED FOR EXCLUSIVE USE BY RESIDENTIAL OR COMMERCIAL UNIT OWNERS IN ACCORDANCE WITH SECTION 3.3.4 OF THE DECLARATION.

**ASM**
AMERICAN SURVEYING & MAPPING
270 EAST SOUTH STREET SUITE 180 • ORLANDO, FLORIDA 32801
(407) 426-7979

PAGE 3 OF 46

LEASE GUARANTY AGREEMENT

WHEREAS, **MY PROPERTY HOLDINGS, LLC.**, a Florida Limited Liability Company, as Landlord, and **FUNKY MONKEY, INC**, a **Florida corporation**, as Tenant, negotiated a Lease effective the ____ day of **April, 2011**, for that certain Premises located at CU-3 of the Sanctuary a Condominium, 100 S Eola Dr. , Orlando, FL 32801 ("Lease") (this Guaranty Agreement being attached as an exhibit to said Lease which is executed contemporaneously herewith), and

WHEREAS, the undersigned have requested Landlord to execute and deliver said Lease on the condition that the undersigned execute this Agreement as Guarantors; and

WHEREAS, the undersigned have agreed to execute this Guaranty in order to induce the Landlord to execute and deliver the aforesaid Lease:

NOW THEREFORE, The undersigned (jointly and severally, if more than one) ("Guarantor") in consideration of the execution and delivery of the aforesaid Lease by the Landlord, and for other valuable consideration, receipt of which is hereby acknowledged by the Guarantor, it is agreed as follows:

1.    The undersigned Guarantor, jointly and severally, do hereby guarantee to the Landlord and to any mortgagee holding a mortgage upon the interest of Landlord in the Leased Premises, the due and punctual payment of all rent payable under said lease, and each and every installment thereof, as well as the full and prompt and complete performance by the Tenant of all and singular the covenants, conditions and provisions in said Lease contained on the part of the Tenant therein to be kept observed and performed, for the full Term of said Lease and any extension thereof, as permitted by Lease with no less force and effect than if the undersigned were named as the Tenant in said Lease, and the undersigned jointly and severally will forthwith on demand pay all amounts at any time in arrears, and will make good any and all defaults occurring under said Lease.

2.    This Guaranty shall be absolute, continuing and unlimited, and the Landlord shall not be required to take any proceedings against the Tenant, or give any notice to the undersigned before the Landlord has the right to demand payment or performance by the undersigned upon default by the Tenant. This Guaranty and the liability of the undersigned hereunder shall in no way be impaired or affected by any assignment which may be made of said Lease, or any subletting thereunder, or by any extension(s) of the payment of any rental or any other sums provided to be paid by Tenant, or by any forbearance or delay in enforcing any of the terms, conditions, covenants or provisions of said Lease or any amendment, modification or revision of said Lease.

3.    No action or proceeding brought or instituted under this Guaranty against the undersigned, and no recovery had in pursuance thereof shall be any bar or defense to any further action or proceeding which may be brought under this Guaranty by reason of any further default or defaults of Tenant.

Guaranty Revised 4-8-2011.wpd                                    **Page 1 of 2**

4.    The liability of the undersigned shall not be deemed to be waived, released, discharged, impaired or affected by reason of the release or discharge of the Tenant in any creditors, receivership, bankruptcy (including Chapter X or Chapter XI bankruptcy proceedings or other reorganization proceedings under the Bankruptcy Act) or other proceedings, or the rejection or disaffirmance of the Lease in any proceedings.

5.    There shall be no modification of the provisions of this Guaranty unless the same be in writing and signed by the undersigned and the Landlord.

6.    All of the terms, agreements and conditions of this Guaranty shall be joint and several, and shall extend to and be binding upon the undersigned, their heirs, executors, administrators, and assigns and shall inure to the benefit of the Landlord, its successors, and assigns, and to any future owner of the fee of the premises referred to in the Lease, and to any mortgage on the fee interest of the Landlord in the Premises.

IN WITNESS WHEREOF, the undersigned Guarantor has(have) hereunto set his(their) signature(s) and seals on the _____, day of _____, 2011,

Name: X EDWARD L. NICKELL                     Name: NICOLAS OLIVIERI
Address: _919 web st_                          Address: _111 Duffin ST_
_orlando fl_                                   _orlando, fl 3205_
Phone #: (Cell) _____                  Phone #: (Cell) _407 410 5050_
Email: _Eddie @ Pantry Mark_                   Email: _Nickmas @ millennium ins.com_
Social Security # _____                Social Security # _____

Driver's License(s) [Attach Copy]            Driver's License(s) [Attach Copy]